**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**BEAUFORT DIVISION**

| | | |
|---|---|---|
| OAKWOOD PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 9:20-cv-04107-DCN |
| vs. | ) | |
| | ) | |
| SWK TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | ) | |
| OAKWOOD PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 9:22-cv-01538-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| ACUMATICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

The following matter is before the court on two motions for summary judgment in two consolidated cases, Oakwood Products, Inc. v. SWK Technologies Inc., No. 22-cv-04107-DCN ("SWK"), and Oakwood Products, Inc. v. Acumatica, Inc., No. 22-cv-01538-DCN ("Acumatica").[1]  First is SWK Technologies, Inc.'s ("SWK") motion for partial summary judgment, SWK, ECF No. 161, and second is Acumatica, Inc.'s ("Acumatica") motion for summary judgment, SWK, ECF No. 162; Acumatica, ECF No. 90.  For the reasons set forth below, the court grants in part and denies in part SWK's motion and grants in part and denies in part Acumatica's motion.

_____

[1] Throughout this order, filings in Acumatica, No. 22-cv-01538-DCN will be cited to as Acumatica, followed by the ECF filing number in that case, and filings in SWK, No. 22-cv-04107-DCN will be cited to as SWK, followed by the ECF filing number in that case.

# I.  BACKGROUND

## A.  Factual Background[2]

Both of these actions arise out of an ongoing dispute related to the now terminated business relationship between Oakwood, SWK, and Acumatica.  SWK is an information technology consulting company that provides enterprise resource planning, accounting software products, and related services.  It assists with the implementation of third-party software products, including Sage 500 and Acumatica ERP, which are business management software programs that assist companies with their accounting, supply chain, and other needs.  Acumatica is the developer of Acumatica ERP.  Acumatica has no sales force of its own, so it partners with companies like SWK and expressly licenses and permits them to market, license, sell, and implement its software products, including Acumatica ERP.

Oakwood is a South Carolina corporation that operates a fine organics manufacturing facility in North Estill, South Carolina.  On or around January 21, 2019, SWK and Oakwood entered into a Statement of Work ("SOW") in which SWK agreed to transition Oakwood's business management software from Sage 500 to Acumatica ERP.  The SOW was accompanied by a Master Services Agreement ("MSA"), which both parties signed on or around January 28, 2019.  Oakwood also contracted to receive a license for Acumatica ERP through an Acumatica Order Form ("Order Form"), which Oakwood signed on February 12, 2019.

---

[2] The court dispenses with citations and provides this short explanation of the facts and allegations giving rise to this case for background purposes and to aid in understanding the court's reasoning.  The court ultimately bases its decision on the facts and portions of the record cited in the discussion section of this order.

According to Oakwood, SWK failed to identify and address several issues with the Acumatica ERP implementation in a suitable manner.  These alleged deficiencies included issues with the program speed and with its shipping and pricing features, which were crucial to Oakwood's business.  Oakwood also claims that SWK's project managers lacked certain technical proficiencies, causing a delay in the transition from Sage 500 to Acumatica ERP.  Fourteen months after the project start date, SWK had yet to complete the transition.  As a result, Oakwood hired a third-party vendor, TechRiver, LLC ("TechRiver"), to analyze the incomplete configuration of Acumatica ERP.  Based on TechRiver's recommendation, Oakwood ultimately decided to upgrade its Sage 500 software using TechRiver rather than complete the deployment of Acumatica ERP with SWK.

### B.  Relevant Procedural History

On October 27, 2020, Oakwood filed a complaint in the Hampton County Court of Common Pleas against SWK, SWK, ECF No. 1-1, and on November 25, 2020, SWK removed the action to this court, SWK, ECF No. 1.  With leave of the court, Oakwood filed its second amended complaint, which is now the operative complaint, on July 6, 2022.  SWK, ECF No. 69, 2d Amend. Compl.  Oakwood's remaining causes of action against SWK are for: (1) rescission of contract, (2) breach of contract, (3) fraudulent nondisclosure, (4) breach of warranty, and (5) violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code Ann. § 39-5-10, et seq.  Id.; SWK, ECF No. 67 at 25 (order granting partial summary judgment on previously asserted claims).[3]

---

[3] As will be addressed later in this order, Oakwood's second amended complaint against SWK still lists causes of action for fraud and negligent misrepresentation and for fraud in the inducement.  SWK, 2d Amend. Compl.  The court granted partial summary

On May 13, 2022, Oakwood filed a complaint against Acumatica, asserting that Acumatica failed "to exercise appropriate control and failed to prevent SWK from marketing, licensing, selling, and implementing Acumatica's product in situations where it was unfeasible for use." Acumatica, ECF No. 1, Compl. ¶ 3. Based on these allegations, Oakwood pursues four causes of action against Acumatica: (1) negligence/gross negligence; (2) violation of SCUTPA; (3) recission; and (4) unjust enrichment. Id. On July 21, 2022, the parties agreed to consolidate the two cases for purposes of discovery and trial. SWK, ECF No. 72.

On August 15, 2024, SWK moved for partial summary judgment, SWK, ECF No. 161, and Acumatica moved for summary judgment, SWK, ECF No. 162; Acumatica, ECF No. 90.[4] Oakwood responded in opposition to SWK's motion on September 9, 2024, SWK, ECF No. 167, and to Acumatica's motion on September 10, 2024, SWK, ECF No. 170; Acumatica, ECF No. 98. On September 27, 2024, SWK replied to Oakwood's response to its motion, SWK, ECF No. 176, and Acumatica replied to Oakwood's response to its motion, SWK, ECF No. 177; Acumatica, ECF No. 105. The court held a hearing on both pending motions on December 18, 2024, SWK, ECF No. 183; Acumatica, ECF No. 114, which was resumed via video on February 5, 2025, SWK, ECF No. 186.[5]

---

judgment on these claims on June 10, 2022, but denied summary judgment on the fraud and negligent misrepresentation cause of action to the extent Oakwood brings a claim for fraudulent nondisclosure. SWK, ECF No. 67.

[4] Acumatica's motion for summary judgment and most of its related filings were filed in duplicate in both SWK and Acumatica.

[5] The court adjourned the December 18, 2024 hearing before the parties had completed their arguments so that out-of-town counsel would not miss his flight. See SWK, ECF No. 183; Acumatica, ECF No. 114. The court then resumed the hearing on

After the hearing, Oakwood moved for leave to file supplemental briefing related to an issue it failed to include in its initial response in opposition to Acumatica's motion. SWK, ECF No. 188; Acumatica, ECF No. 118. The court granted Oakwood's motion for leave to file its supplement on February 10, 2025. SWK, ECF No. 190; Acumatica, ECF No. 121. The court also requested that each party file additional supplemental briefing on other, related issues. That same day, Oakwood filed a supplemental response in opposition to Acumatica's motion for summary judgment. Acumatica, ECF No. 122. On February 21, 2025, Oakwood filed a supplemental response in opposition to SWK's motion for summary judgment, SWK, ECF No. 191; Acumatica, ECF No. 123, and a second supplemental response in opposition to Acumatica's motion for summary judgment, SWK, ECF No. 192; Acumatica, ECF No. 124.[6] SWK then replied to Oakwood's supplement on March 5, 2025, SWK, ECF No. 194; Acumatica, ECF No. 126, and Acumatica replied to Oakwood's supplement on March 7, 2025, SWK, ECF No. 195; Acumatica, ECF No. 127. As such, both motions are now fully briefed and ripe for the court's review.

_____

February 5, 2025, so that the parties could complete their remaining arguments. See SWK, ECF No. 186.

[6] In other words, Oakwood filed a total of three supplemental responses—one directed at SWK's motion and two directed at Acumatica's motion. The two supplements directed at Acumatica's motion are similar, and there is a great deal of overlap in their arguments. Perplexingly, however, Oakwood includes a few arguments in its first supplement that it does not include in its second supplement and vice versa. To make matters more confusing, Oakwood filed its February 10, 2025 supplement in opposition to Acumatica's motion only in the Acumatica docket but filed its two February 21, 2025 supplements, and seemingly all of its other filings, in both the SWK and Acumatica dockets. See SWK, ECF Nos. 191; 192; Acumatica, ECF Nos. 122; 123; 124. Acumatica then replied only to the supplement Oakwood filed in both dockets, which the court suspects was an oversight caused by Oakwood's filing error. Nonetheless, to the extent Oakwood's arguments in these two supplements differ, the court does not address those arguments in this order for reasons explained below.

## II.  STANDARD

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  In so doing, the court must view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor.  Id. at 255.

## III.  DISCUSSION

The court will start by considering SWK's motion before moving to Acumatica's motion.

## A.  SWK's Motion

SWK moves for summary judgment on Oakwood's claims for a violation of the SCUTPA and for fraudulent nondisclosure.[7]  SWK, ECF No. 161.  SWK also argues that the court should find that any damages Oakwood might recover in this case are limited by the limitation of liability provision in the MSA.  Id.  Finally, SWK contends that the court should reaffirm its prior dismissal of Oakwood's claims for fraud and negligent misrepresentations and fraud in the inducement.  Id. at 2–3.  The court will start by considering SWK's arguments on Oakwood's SCUTPA claim; will proceed to consider whether the MSA limits Oakwood's possible recovery; and will conclude by addressing fraud and negligent misrepresentation, fraud in the inducement, and Oakwood's related claim for fraudulent nondisclosure.

### 1.  Oakwood's Claim Against SWK for a SCUTPA Violation

A plaintiff seeking to maintain an unfair trade practices claim under the SCUTPA must establish:

> (1) the defendant engaged in an unlawful trade practice; (2) the plaintiff suffered actual, ascertainable damages as a result of the defendant's use of the unlawful trade practice; and (3) the unlawful trade practice engaged in by the defendant had an adverse impact on the public interest.

Bessinger v. Food Lion, Inc., 305 F. Supp. 2d 574, 579 (D.S.C. 2003), aff'd, 115 F. App'x 636 (4th Cir. 2004).  SWK argues that it is entitled to summary judgment on Oakwood's SCUTPA claim for two reasons: first, Oakwood failed to demonstrate a genuine issue of material fact over whether SWK engaged in any unfair or deceptive acts, and second, Oakwood failed to demonstrate a genuine issue of material fact over whether

---

[7] SWK is not moving for summary judgment on Oakwood's claims for rescission, breach of contract, or breach of warranty, and SWK specifically concedes that there is a genuine issue of material fact as to the contract claim.  SWK, ECF No. 176 at 4 n.2.

SWK's alleged conduct adversely impacted the public interest.  SWK, ECF No. 161 at 10.  The court will take each of these issues in turn.

### a. Unfair or Deceptive Acts

Overall, SWK argues that Oakwood's SCUTPA claim is based on nothing more than SWK being unable to perform as it predicted, that such representations are not actionable, and that Oakwood can point to no other case in which another customer required the same level of customization, especially after the MSA and SOW were executed.  SWK, ECF No. 161 at 11–13.  SWK contends that Oakwood bases its claim on SWK's representations that it had the skill, knowledge, and expertise in implement Acumatica ERP.  Id. at 11.  However, SWK argues Oakwood had no right to rely on SWK's predictions of future events when those predictions were not false when made. Id.  SWK points to testimony from Dr. Jeanne Stewart ("Stewart"), Oakwood's 30(b)(6) designee, in which Stewart stated that SKW simply overstated its ability to perform.[8] SWK, ECF No. 161 at 11.  SWK also notes that the court previously ruled that there is no genuine dispute of material fact that statements in the SOW and MSA were future promises and not actionable, that Oakwood did not rely on these statements as the equivalent to facts, and that Oakwood was not fraudulently induced into entering into the MSA.  Id. at 12; see also infra Section III.A.3.  SWK argues that its statements were puffery, rather than unfair trade practices.  SWK, ECF Nos. 161 at 13; 176 at 2–5.

---

[8] Stewart testified in multiple depositions and later followed up with a separate declaration.  See SWK, ECF Nos. 161-3; 161-4; 175-5.  During the first hearing, SWK argued that the court should disregard the legal arguments in her declaration, but SWK expressly declined to challenge Stewart's factual claims in her declaration.  Tr. 21:14–22:14.  Therefore, the court disregards the portions of Stewart's declaration in which she makes legal arguments but considers the portions of the declaration in which she makes factual assertions.

In response, Oakwood argues that there is sufficient evidence demonstrating that there is a genuine issue of material fact over whether SWK engaged in unfair and deceptive conduct. SWK, ECF No. 175 at 41–46. Oakwood points to the fact that Dene Powell ("Powell") and Jeremy Potoka ("Potoka"), two members of SWK's sales team, spent extensive time learning Oakwood's business needs and even performed a live demonstration of a product for Oakwood that was ultimately unavailable. Id. Oakwood argues that, from this, a jury could find that Powell and Potoka made specific factual representations to Oakwood about Acumatica ERP's suitability to Oakwood's business and its functionality that were untrue. Id. Oakwood further argues that this is more than puffery because it amounts to specific factual assurances. Id. at 44. Moreover, Oakwood also argues that the evidence shows that SWK made specific assurances about product features that were essential for Oakwood's business and, in actuality, were not available without extensive customization. Id. Finally, Oakwood asserts that SWK misled Oakwood into believing that it had the knowledge and capacity to implement Acumatica ERP. Id. at 46.

The SCUTPA defines unlawful trade practices as "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade." S.C. Code Ann. § 39–5–20(a). "An unfair trade practice has been defined as a practice which is offensive to public policy or which is immoral, unethical, or oppressive." deBondt v. Carolton Motorcars, Inc., 536 S.E.2d 399, 407 (S.C. Ct. App. 2000). Notably, "a plaintiff need not prove the elements of common law deceit in order to establish a violation of the [SCUTPA] since, under the statute, there is no need to show that a claim or representation was intended to deceive but only that it had the capacity, effect, or

tendency to deceive." Young v. Century Lincoln-Mercury, Inc., 396 S.E.2d 105, 108 (S.C. Ct. App. 1989), aff'd in part, rev'd in part on other grounds, 422 S.E.2d 103 (S.C. 1992). In other words, "[t]he plaintiff need not show intentional deception, but a plaintiff cannot prevail without showing at least a potential of deception." Clarkson v. Orkin Exterminating Co., Inc., 761 F.2d 189, 191 (4th Cir. 1985) (applying South Carolina law). "Even a truthful statement may be deceptive if it has a capacity or tendency to deceive." Young, 396 S.E.2d at 108. Still, "[a] statutory prohibition of deceptive practices simply does not reach expected puffing of a vendor's product nor authorize an award of damages solely on the basis of testimony from a competitor that the product is ineffective." Clarkson, 761 F.2d at 191.

There is sufficient evidence for a jury to find that SWK engaged in deceptive conduct when it made representations about the suitability of Acumatica ERP for Oakwood's business and about SWK's ability to implement Acumatica ERP to meet Oakwood's business needs. As Oakwood points out, SWK representatives (namely Powell and Potoka) met with Oakwood representatives during a series of "discovery meetings" to discern Oakwood's unique needs. See SWK, ECF Nos. 175-2, Stewart Decl. ¶¶ 9–13; 175-5, Powell Depo. at 57:4–58:6; 175-6, Oakwood 30(b)(6) Designee (Stewart) Depo. at 29:7–37:10. As part of this process, Stewart and Powell met on October 24, 2018, to review the customizations that Oakwood had made to its existing Sage 500 platform and those that Oakwood wanted SWK to replicate in its new Acumatica ERP platform. Stewart Decl. ¶ 16. Stewart and Powell met again virtually on October 31, 2018, and discussed these needs further. Id. ¶ 18; SWK, ECF No. 175-2 at 37 (virtual meeting invitation). Stewart testified in her declaration that, during these

10

meetings, the parties specifically discussed multiple-pick shipping[9] and a credit card reauthorization feature, both of which were essential to Oakwood's business. Stewart Decl. ¶ 14. Powell testified in his deposition that he had previously sold Sage 500 and was familiar with that system as well as Acumatica ERP. Powell Depo. at 34:11–21. Yet Stewart testified that, at no point in either of these meetings, did Powell express any reservation about SWK's ability to customize Acumatica ERP to meet Oakwood's needs. Stewart Decl. ¶¶ 16–19.

Also on October 31, 2018, Powell suggested that he and Potoka travel to Oakwood's office to meet with Stewart, as well as Oakwood's president, Greg Butler ("Butler") and another Oakwood employee, Caroline Koger ("Koger"). SWK, ECF No. 175-2 at 39 (email from Powell suggesting meeting at Oakwood's office). Stewart testified that, during the meeting, the participants discussed Oakwood's needs for a multi-pick shipping feature and credit card payments, and Powell and Potoka assured Oakwood that Acumatica ERP would be a great fit for their needs. Stewart Decl. ¶ 28. Stewart

---

[9] Multiple-pick or multi-pick shipping is the ability to take a sales order from one of Oakwood's customers and break down the order into multiple different shipments. Oakwood 30(b)(6) Depo. at 15:1–5. This feature is essential to Oakwood's business because, when it ships organic compounds to customers, it is hazardous for certain compounds to be packed with certain other compounds. Id. at 14:21–25. Oakwood had the ability to do multi-pick shipping under its Sage 500 software. Id. at 15:6–14.

SWK argues that Stewart testified in her various depositions that she did not make SWK aware of its need for multi-pick shipping until after the parties entered into the SOW and Agreement and that the relationship between SWK and Oakwood broke down when it became clear that it was going to be very expensive to add this feature. SWK, ECF No. 161 at 5–8. In her December 20, 2023 deposition, Stewart testified that she brought the multi-pick issue up during SWK's discovery meetings, but she could not remember if that meeting took place before or after Oakwood and SWK entered into the SOW or Agreement. Stewart's Dec. 20, 2023 Depo. at 36:8–38:17. In her subsequent declaration, Stewart maintained that this issue was addressed at the discovery meetings and, after consulting her records, clarified that the discovery meetings took place before the parties entered into a contract. Stewart Decl. ¶ 13.

also testified that Oakwood told Powell and Potoka "that Oakwood wanted to create a 'view' like it had in the Sage 500 platform" and that Potoka and Powell stated that this would be "no problem." Stewart Decl. ¶¶ 34–35 (emphasis omitted). During the meeting, Potoka and Powell performed a live proof of concept demonstration for Oakwood. Id. ¶ 31; Powell Depo. 57:4–15. Stewart claims in her declaration that Potoka and Powell showed Oakwood screens of Acumatica ERP that were very similar to Oakwood's Sage 500 platform and represented that Oakwood's requests could be easily accommodated. Stewart Decl. ¶ 35. During the demonstration, SWK showed Oakwood what its implementation of Acumatica ERP might look like, and Stewart testified that SWK "intentionally created the impression that SWK could (and somehow did) create or manipulate something in the Acumatica ERP platform during the sales process with no problem that it actually could not (and did not) create or replicate for Oakwood during the implementation." Stewart Decl. ¶ 32; accord ECF No. 175-3, Butler Decl. ¶ 6; see also Powell Depo. 57:4–58:11.

Stewart further testified that, on November 20, 2018, she had a phone call with Powell and Jeb Buddecke ("Buddecke"), SWK's practice manager. Id. ¶ 37. Buddecke was familiar with Sage 500, and during this call, Buddecke and Powell assured Stewart that Acumatica ERP would be a good replacement for Oakwood's Sage 500 platform. Id. Stewart claims that, during this call, "the sentiment again was that our business processes and functionality requirements, such as the way we processed sales orders, credit card payments, and shipments in our Sage 500 platform would be similar in Acumatica ERP and able to be replicated." Id. ¶ 38. Finally, Stewart asserts in her declaration that Oakwood signed the MSA and SOW based on its understanding that SWK fully

12

understood its needs, including the multi-pick feature, credit card payments, and shipments in its Sage 500 platform.  Id. ¶ 39.

In February 2020, Acumatica's Director of Services, Todd Kuhns ("Kuhns"), emailed various SWK employees, including Buddecke and Powell, to explain that Acumatica does not include a multi-pick shipment option out of the box without customization.  ECF No. 175-7 at 4.  Kuhns estimated that it would cost Oakwood around $32,000 to develop such a solution.  Id.  Powell responded "Wow . . ."  Id. at 3.  Buddecke responded:

> Just internal...
> This should be standard functionality...I keep telling everyone that Acumatica needs to spend more time making the product deeper instead of wider.  It's a great product but there are definitely holes that need to be fixed.  That's not sexy but its important for the integrity of the product
> * Multiple shipments from one order
> * Make replenishment more robust
> * Lot/serial management
> * Etc

Id. at 3.  Powell then asked, "500 does this out of the box.  Right?"  Id. at 2.  To which, Buddeke responded, "Yes.  It didn't in original versions but has for the past 10 years."  Id.  Despite these internal emails, neither Buddecke nor Powell shared this information with Oakwood.  Stewart Decl. ¶ 46.

Viewing this evidence in the light most favorable to Oakwood, a reasonable jury might find that SWK's employees made representations during the discovery process that had the capacity to deceive regarding its capability to implement Acumatica ERP in a way that replicated Oakwood's then-current experience with Sage 500.  It may be true, as SWK argues, that the representations made by SWK's representatives were not intended to deceive and may have even been true.  However, a reasonable jury could still find that

the statements "had the capacity, effect, or tendency to deceive." Young, 396 S.E.2d at

108. A reasonable jury might also find that SWK's representations were beyond

expected puffery of a vendor's product because they could constitute specific promises

about the capabilities of SWK's ability to implement Acumatica ERP to meet Oakwood's

needs that were not true. Cf. Clarkson, 761 F.2d at 191. Consequently, the court finds

that there is a genuine issue of material fact over whether SWK engaged in unfair or

deceptive practices.[10]

### b. Public Interest

The court similarly finds that there is a genuine issue of material fact as to

whether SWK's conduct impacted the public interest. A plaintiff may show that unfair or

deceptive acts or practices have an impact upon the public interest by demonstrating a

potential for repetition. Haley Nursery Co. v. Forrest, 381 S.E.2d 906, 908 (S.C. 1989);

Noack Enters., Inc. v. Country Corner Interiors of Hilton Head Island, Inc., 351 S.E.2d

347, 350–51 (S.C. Ct. App. 1986). The potential for repetition is generally demonstrated

in one of two ways: "(1) by showing the same kind of actions occurred in the past, thus

making it likely they will continue to occur absent deterrence; or (2) by showing the

company's procedures create a potential for repetition of the unfair and deceptive acts."

Wright v. Craft, 640 S.E.2d 486, 502 (S.C. Ct. App. 2006). SCUTPA relief is "not

---

[10] Additionally, SWK makes much of the fact that the court previously ruled that SWK's representations about a future promise to implement Acumatica ERP were not actionable. SWK, ECF No. 161 at 12 (citing SWK, ECF No. 67 at 18–19). However, what the court found was that these statements were not actionable as fraud or negligent misrepresentations. SWK, ECF No. 67 at 15–19. It does not necessarily follow that the standard for what an action constituting fraud or negligent misrepresentation is the same as those constituting an unfair or deceptive act under the SCUTPA. See Young, 396 S.E.2d at 108 (noting that "a plaintiff need not prove the elements of common law deceit" to establish a SCUTPA violation).

14

available to redress a private wrong where the public interest is unaffected." Columbia E. Assoc. v. Bi–Lo, Inc., 386 S.E.2d 259, 263 (S.C. Ct. App. 1989). Even "a deliberate or intentional breach of a valid contract, without more, does not constitute a violation of the [SCUTPA]." Id.

SWK argues that none of its other customers required the same level of customization as Oakwood and no other customer shared Oakwood's unique software modification requirements (i.e., multi-pick shipping). SWK, ECF No. 161 at 16–17. It contends that other allegedly unsatisfied customers with different customization needs do not show a pattern of unfair or deceptive conduct. Id. at 17.

In response, Oakwood argues that SWK engaged in a pattern of misleading and deceitful sales practices with three of its former customers: Arch-I-Tech Doors ("Arch-I-Tech"), Champion Thread Company ("Champion Thread"), and Tom Fouts Tire Co. ("Tom Fouts"). SWK, ECF No. 175 at 47. Oakwood argues that it does not have to show that these other companies were in the exact same scenario as Oakwood. Id. Rather, according to Oakwood, it need only show that these other customers all were misled and deceived by SWK in similar ways to show that "the conduct" at issue is capable of repetition. Id. (quoting RFT Mgmt. Co., LLC v. Powell, 607 F. App'x 238, 244 (4th Cir. 2015)).

In reply, SWK argues that Oakwood has not demonstrated this element because the evidence it collected from Arch-I-Tech, Champion Thread Company, and Tom Fouts Tire indicates nothing more than three separate, individual breaches of contract. SWK, ECF No. 176 at 5. SWK contends that it is irrelevant that each of these customers feels they were misled because each required unique customization solutions, and SWK

15

maintains that its individual conduct affecting only SWK and these three specific customers does not impact the public interest.  Id. at 6.

A jury could find from the evidence in the record that SWK's conduct toward Arch-I-Tech, Champion Thread, and Tom Fouts was sufficiently similar to its conduct with Oakwood to satisfy SCUTPA's public interest element.  Arch-I-Tech's 30(b)(6) designee testified that, like Oakwood, Arch-I-Tech worked with Potoka and Powell and that Arch-I-Tech told SWK about its specific business practices and needs.  SWK, ECF No. 175-17, Arch-I-Tech 30(b)(6) Depo. at 25:3–13, 32:22–33:1.  According to Potoka's internal notes regarding the Arch-I-Tech implementation, Potoka had concerns about Acumatica's ability to meet Arch-I-Tech's needs.  See SWK, ECF No. 175-18 at 1 (listing Arch-I-Tech's requirements that may not "be available in the Acumatica product").  Despite this, SWK never informed Arch-I-Tech of these concerns through the sales process.  See Arch-I-Tech 30(b)(6) Depo. at 37:21–25, 39:24–40:5.  When problems arose, Will Marple ("Marple"), Arch-I-Tech's design and development consultant sent SWK's Development Manager an email in which Marple stated: "Our team is experiencing some pretty significant disillusionment in the wake of our recent character limitation discovery.  That was not at all the product we were sold, nor was that what was demonstrated during the sales process (which leveraged our own data)."  SWK, ECF No. 175-14 at 1.

Similarly, Champion Thread, much like Oakwood, considered upgrading its existing Sage software, but Powell convinced Champion Thread to go with Acumatica ERP instead.  SWK, ECF No. 184-3, Champion Thread 30(b)(6) Depo. at 27:9–28:11.  Also like Oakwood, Powell and Potoka visited Champion Thread and discussed its

16

specific needs related to its new software.  Id. at 38:14–40:6.  During these visits, Champion Thread told Powell and Potoka about its business process and its needs, specifically including the ability to scan yarn into its inventory.  Id. at 39:5–40:6. Eventually, it was discovered that the Acumatica ERP software could not scan barcodes in the way that SWK had represented.  Id. at 66:9–67:19.  Champion Thread's 30(b)(6) witness further testified that it had told SWK that it needed a product that could integrate with a platform called Salesforce, and that SWK told Champion Thread that Acumatica ERP could interface with Salesforce out of the box when that was not true.  Id.  at 96:10– 97:12.

Finally, Tom Fouts is a tire distributor based in Gainesville, Georgia.  SWK, ECF No. 175-36, Perkins Decl. ¶ 7.  Like Oakwood and the other SWK customers, Tom Fouts contracted with SWK to purchase and install Acumatica ERP.  Id. ¶ 9.  Powell represented the functionality of Acumatica ERP to Tom Fouts.  Id. ¶ 11.  According to Lawrence Perkins ("Perkins"), who was working with Tom Fouts to assist with selection of an ERP solution, SWK's implementation fell behind schedule.  Id. ¶¶ 8, 15. Eventually, Perkins discovered that many of the features of Acumatica ERP that SWK had discussed required heavy customizations, "which is not what was represented by SWK during the sales process," even though the functionality of Acumatica ERP is what caused Tom Fouts to select Acumatica ERP during the sales process.  Id. ¶ 17–20.

It may be true, as SWK points out, that each of these customers experienced their own unique needs and unique problems associated with SWK's implementation. However, a reasonable jury could find that SWK's conduct was similar in each case— that is, that SWK made representations during the sales process regarding the suitability

of its products (and the level of required customization) that were deceptive.

Consequently, a reasonable jury could find for Oakwood on the public interest element.

See Wright, 640 S.E.2d at 502.  As such, the court denies SWK's motion for summary

judgment on Oakwood's SCUTPA cause of action.

### 2.  Liability Limitations in the MSA

The SCUTPA permits a plaintiff to bring an action to recover actual damages for

"any ascertainable loss of money or property, real or personal, as a result of the use or

employment by another person of an unfair or deceptive method, act or practice."  S.C.

Code Ann. § 39-5-140(a).  If the court determines that a defendant's unfair or deceptive

method, act or practice was a willful or knowing violation of the SCUTPA, the statute

requires that the court "award three times the actual damages sustained and may provide

such other relief as it deems necessary or proper."  Id.  The issue before the court is

whether the MSA limits Oakwood's possible recovery of the SCUTPA's treble damages

award.

Specifically, Paragraph 7 of the MSA is captioned, "Limitations on Liability."

SWK, ECF No. 161-2 ¶ 7.  It states:

> IN NO EVENT SHALL SWK BE LIABLE TO CUSTOMER OR ANY
> OTHER PERSON OR ENTITY FOR ANY LOSS OF RECORDS OR
> DATA OR FOR SPECIAL, EXEMPLARY, INDIRECT,
> CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY KIND OR
> NATURE WHATSOEVER, WHETHER OR NOT THE POSSIBILITY
> OF SUCH DAMAGES HAS BEEN DISCLOSED TO SWK IN
> ADVANCE OR COULD HAVE BEEN REASONABLY FORESEEN BY
> SWK, AND WHETHER IN AN ACTION BASED ON CONTRACT,
> WARRANTY, STRICT LIABILITY, TORT OR OTHERWISE.  SWK'S
> TOTAL LIABILITY FOR DAMAGES ARISING OUT OF THIS
> AGREEMENT OR ANY STATEMENT OF WORK FOR ANY
> SERVICES PERFORMED OR PRODUCTS OR DELIVERABLES
> PROVIDED HEREUNDER OR THEREUNDER, WHETHER IN AN
> ACTION BASED ON CONTRACT, WARRANTY, STRICT LIABILITY,
> TORT OR OTHERWISE, SHALL NOT EXCEED THE TOTAL

AMOUNT PAID OR PAYABLE BY CUSTOMER TO SWK HEREUNDER.

Id.

SWK argues that any damages sought by Oakwood must be capped by the MSA's liability limitation provision because the provision clearly evinces the intent of the parties to limit SWK's liability for any claim asserted by Oakwood. SWK, ECF Nos. 161 at 25–27; 176 at 10–11; 194 at 2–5. In response, Oakwood concedes that the court previously ruled that the liability limitations in Paragraph 7 of the MSA is not unconscionable and is enforceable. SWK, ECF No. 175 at 52 (citing SWK, ECF No. 40 at 14–17). However, Oakwood notes that the court's prior order does not resolve whether the MSA's liability limitation applies to statutory or treble damages awarded under the SCUTPA.[11] SWK, ECF No. 175 at 52.

In its supplement, Oakwood argues that resolving this issue requires addressing both questions of fact and law. SWK, ECF No. 191. On the one hand, whether the parties intended to limit SWK's liability is a question of fact, but on the other hand, whether the liability limitation is unconscionable or unenforceable for public policy reasons is a question of law. Id. SWK agrees that the issue of whether the liability limitation is unenforceable is a question of law. SWK, No. 194 at 5–6. SWK also argues that the liability limitation provision's terms are clear and unambiguous, meaning the interpretation of the parties' intent is also a question of law. Id. at 2–5.

---

[11] While the court previously found that the MSA's liability limitation provision is not unconscionable, SWK, ECF No. 40 at 14–17, it did so before Oakwood amended its complaint to allege a SCUTPA violation, see SWK, 2d Amend. Compl. ¶¶ 90–99 (alleging a SCUTPA violation for the first time).

The court starts with determining whether there is a genuine issue of material fact over the proper interpretation of the MSA's liability limitation provision. In essence, Oakwood primarily focuses on the first sentence of the liability limitation provision and notes that it does not specifically address statutory or multiple damages. SWK, ECF Nos. 175 at 52; 191 at 3. It therefore contends that there is a question of fact over whether the parties intended to insulate SWK from treble damages for a SCUTPA violation and argues that, under South Carolina law, courts must construe liability limitation provisions against the drafter. SWK, ECF Nos. 175 at 52; 191 at 3–4.

In making this argument, Oakwood relies heavily on the South Carolina Supreme Court's decision in Maybank v. BB&T Corp., 787 S.E.2d 498, 515 (S.C. 2016). See SWK, ECF No. 175 at 52. In Maybank, the court interpreted the following clause:

> F. Limitation of Liability and Indemnification. Client agrees:
>
> 1. Bank and Investment Advisor shall not be liable with respect to their services under this Agreement except for any loss attributable to their negligence or willful misconduct. In no event shall Bank or Investment Advisor be liable for any incidental, indirect, special, consequential or punitive damages.

787 S.E.2d at 514. Because the drafter of this clause "failed to explicitly limit statutory or multiple damages," the court declined to extend the clause to insulate the drafter from treble damages awarded under the SCUTPA. Id. at 517.

Like in Maybank, the first sentence of SWK's liability limitation porovision does not specifically mention statutory or multiple damages. See SWK, ECF No. 161-1 ¶ 7. However, unlike the clause in Maybank, the next sentence of the liability limitation provision clearly limits "SWK's total liability" to "the total amount paid or payable" by

Oakwood under the MSA.[12]  SWK, ECF No. 161-1 ¶ 7 (emphasis omitted).  Thus, it may be true, as Oakwood argues, that liability limitation provisions should be strictly construed against the drafter.  Maybank, 787 S.E.2d at 516–17.  "Nevertheless, a court's ultimate duty is confined to interpreting the contractual provisions agreed to by the parties . . . .  When the contract's language is clear and unambiguous, the language alone determines its force and effect."  Id. at 515–16.  Because the second sentence of liability limitation provision clearly and unambiguously shields SWK from damages beyond the amount that was payable under the MSA, the court finds that the plain language of this provision shields SWK from treble damages under the SCUTPA as a matter of law.

Having found no genuine issue of material fact over the parties' intent regarding the MSA's liability limitation provision, the court must still decide whether this limitation is enforceable or if it is unconscionable or barred by public policy.  The court agrees with the parties that this presents a question of law.  See Wingard v. Exxon Co., U.S.A., 819 F. Supp. 497, 502 (D.S.C. 1992).  In many cases, including Maybank, courts have determined whether to treble damages under the SCUTPA through post-trial motions after a jury first finds a defendant liable for a SCUTPA violation and awards actual damages.  See, e.g., Maybank, 787 S.E.2d at 509; Fanczi Screw Co. v. Orix Fin. Servs., Inc., 114 F. App'x 548, 551 (4th Cir. 2004); Dance v. Hall & Hull Architects,

---

[12] Of course, this limitation only applies to any causes of action "based on contract, warranty, strict liability, tort or otherwise."  SWK, ECF No. 161-1 ¶ 7.  SWK argues that a SCUTPA claim is a tort, SWK, ECF No. 194 at 3, and Oakwood has offered the court no reason to suspect otherwise.  The court therefore finds that the liability limitation provision in the MSA is applicable to Oakwood's SCUTPA claim as a "tort or otherwise."  See SWK, ECF No. 161-1 ¶ 7; see also Health Promotion Specialists, LLC v. S.C. Bd. of Dentistry, 743 S.E.2d 808, 815 (S.C. 2013) (treating a SCUTPA claim as a tort for purposes of the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10, et seq.)

Inc., 2008 WL 11349871, at *1 (D.S.C. Dec. 3, 2008).  Thus, the court denies this portion of SWK's motion for partial summary judgment without prejudice and reserves the question of whether to treble damages for post-trial motions that Oakwood may file if necessary.

### 3. Oakwood's Claims Against SWK for Fraudulent Nondisclosure, Fraud and Negligent Misrepresentation, and Fraud in the Inducement

With its latest motion, SWK has asked the court to reevaluate its previous rulings on Oakwood's claim for fraudulent nondisclosure at least three times, and—as SWK points out and no party appears to dispute—the court has already granted summary judgment on Oakwood's related claims for fraud and negligent misrepresentations and fraud in the inducement.  Therefore, the court begins by rearticulating its previous rulings on fraudulent nondisclosure, fraud and negligent misrepresentation, and fraud in the inducement.

Oakwood asserted its claims for fraud and negligent misrepresentation and fraud in the inducement in its September 22, 2021 first amended complaint.  SWK, ECF No. 35, Amend. Compl. ¶¶ 65–84.  SWK then sought partial summary judgment on these two causes of action in a previous motion that it filed on March 25, 2022.[13]  SWK, ECF No. 47.

---

[13] SWK had also previously moved for partial summary judgment on Oakwood's claim for fraud or negligent misrepresentation on August 18, 2021, on the grounds that it was barred by a provision in the MSA disclaiming any warranties beyond an express warranty.  SWK, ECF Nos. 23; 24 at 4–7.  On September 1, 2021, the court denied that portion of SWK's first motion for summary judgment upon finding that the disclaimer of warranties provision did not reach Oakwood's claims for fraud and negligent misrepresentation.  SWK, ECF No. 26 at 18.

On June 10, 2022, the court granted in part and denied in part SWK's March 2022 motion. <u>SWK</u>, ECF No. 67 (the "June 2022 Order"). Notably, the court determined that no "no reasonable juror could find that the SOW or [MSA] were anything but representations about a future promise to implement Acumatica ERP," and as promises about future events, those statements were not actionable false representations. <u>Id.</u> at 18–19. Therefore, Oakwood could not use these statements to support the fraud elements of either its claim for fraud and negligent misrepresentation or its claim for fraud in the inducement, and the court granted partial summary judgment on the fraud and negligent misrepresentation claim and fraud in the inducement claim for this reason. <u>Id.</u> at 16–23.

However, the court went on to determine that there was a genuine dispute of material fact as to whether SWK made a material nondisclosure by concealing and failing to disclose certain facts when it had a duty to do so. <u>Id.</u> at 21. In reaching this finding, the court noted that, under South Carolina law, a duty to disclose generally arises under three circumstances. <u>Id.</u> According to the South Carolina Supreme Court's decision in <u>Jacobson v. Yaschik</u>, such a duty to disclose can arise (1) where there exists a preexisting definite fiduciary relationship between the parties; (2) where one party either expressly or (by virtue of the specific circumstances of the case) implicitly reposes a trust and confidence in the other with reference to the particular transaction in question; or (3) where the very contract or transaction itself, in its essential nature, is intrinsically fiduciary and necessarily calls for perfect good faith and full disclosure. 155 S.E.2d 601, 605 (S.C. 1967). Drawing upon the language of the third category, the court stated in the June 2022 Order: "Viewed in the light most favorable to Oakwood, the nature of the contract between Oakwood and SWK was intrinsically fiduciary." <u>SWK</u>, ECF No. 67 at

21. The court then determined that a genuine dispute of material fact existed as to whether SWK breached that duty and allowed Oakwood's claim for fraudulent nondisclosure to proceed.  Id. at 22.

In addition to this discussion on fraudulent nondisclosure, the court's June 2022 Order also granted Oakwood leave to file its second amended complaint, so that Oakwood could add its SCUTPA claim.  Id. at 9–14.  Oakwood accordingly filed its second amended complaint a few weeks later on July 6, 2022.  SWK, 2d Amend. Compl. Yet, in addition to adding its SCUTPA claim, Oakwood perplexingly repeated its allegations for its fraud and negligent misrepresentation claim and its fraud in the inducement claim in this second amended complaint even though the court had already granted summary judgment on those claims.  Id. ¶¶ 65–84.

In any event, on June 24, 2022, SWK filed a motion requesting clarification on the meaning of the sentence discussing the fiduciary nature of the contract from the June 2022 Order.  SWK, ECF No. 68.  Specifically, SWK requested that the court clarify whether it meant that the contract was intrinsically fiduciary (1) as a matter of law, meaning it was established as the law of the case; or (2) only when viewed in the light most favorable to Oakwood, meaning the issue was still subject to proof before the jury. Id.  Acknowledging that the sentence left some ambiguity, the court issued an order on October 12, 2022 (the "October 2022 Order"), clarifying that it had found, as a matter of law, that SWK owed Oakwood a duty to disclose based on the fiduciary nature of the contract.  SWK, ECF No. 86.

On November 9, 2022, SWK moved for the court to reconsider its October 2022 Order.  SWK, ECF No. 87.  SWK presented two broad arguments.  First, it argued that

24

under South Carolina law, whether a fiduciary relationship exists is a determination for the jury to make. <u>SWK</u>, ECF No., 87-1 at 4–7.  Second, SWK argued that the issue of whether a fiduciary relationship existed was not before the court in the first place.  <u>Id.</u> at 7–9.  The court addressed both of these arguments and ultimately denied SWK's motion to reconsider on February 2, 2023 (the "February 2023 Order").  <u>SWK</u>, ECF No. 98.

In the February 2023 Order, the court first explained that the third <u>Jacobson</u> category "does not require a fiduciary relationship; it merely tests whether a contract or transaction had hallmarks of a fiduciary relationship."  <u>Id.</u> at 8 (citing <u>Consol. Insured Benefits, Inc. v. Conseco Med. Ins. Co.</u>, 2006 WL 3423891, at *10 (D.S.C. Nov. 27, 2006)).  Thus, the court was not finding that the parties had a fiduciary relationship, which the court acknowledged was a jury question, but the court did find "that SWK had a duty to disclose information regarding the future of the Acumatica implementation." <u>Id.</u> at 10.  Second, the court acknowledged that Oakwood had not pled a claim for fraudulent nondisclosure, but Oakwood's claim for fraud and negligent misrepresentation was so interrelated that SWK should have been on notice of a fraudulent concealment/nondisclosure claim.  <u>Id.</u>  Moreover, though no party had briefed the issue of whether a duty existed, the court explained that it reached its conclusion by analyzing whether the SOW and MSA gave rise to a duty, and no additional briefing would have altered its analysis.  <u>Id.</u> at 13.  Thus, the court "denie[d] SWK's motion to reconsider its finding on the duty to disclose and reserve[d] the remaining issues, including whether there was a breach of the duty, for trial."  <u>Id.</u> at 13 (footnote omitted).  The court specifically noted that "[t]his include[d] deciding whether there were material facts that could not have been discovered by the plaintiff, despite its diligence."  <u>Id.</u> at 13 n.4.

In its latest motion, SWK now urges the court to revisit its earlier ruling that SWK had a duty to disclose because the MSA and SOW were intrinsically fiduciary "now that discovery has closed." SWK, ECF No. 161 at 18. SWK argues that the court's reliance on Consolidated Insured Benefits, 2006 WL 3423891, in its February 2023 Order was misplaced because the court in Consolidated Insured Benefits found a duty to disclose based on one party expressly reposing a trust or confidence rather than an intrinsically fiduciary relationship. SWK, ECF No. 161 at 19–20. SWK further argues, once again, that there is not an intrinsically fiduciary relationship in this case. Id. Beyond that, SWK also argues various other reasons why the court should now grant summary judgment even if it does not revisit its earlier decision.[14] SWK, ECF No. 161 at 21–25. Relatedly,

_____

[14] First, SWK contends that, with the benefit of discovery, Oakwood has not identified any action taken in justifiable reliance between October 2019 and January 2020. SWK, ECF No. 161 at 21. SWK reads the court's June 2022 Order as limiting the period during which a fraudulent non-disclosure may have taken place to between October 2019 and January 2020. Id. (citing SWK, ECF No. 67 at 21). According to SWK, Oakwood cannot point to any evidence that it took any action in reliance on SWK's promises during that period. Id. at 22. Second, SWK argues that Oakwood has not shown that, in the exercise of diligence, it was not aware of the significant modification issues of Acumatica ERP. Id. at 22–24. SWK points to evidence showing that both Stewart and TechRiver confirmed that the project was feasible, and Stewart's testimony shows that the reason Oakwood withdrew was because of unexpected cost overruns, not infeasibility. Id. at 23. SWK argues that there can be no liability when the thing that was not disclosed could have been ascertained by on the plaintiff's own due diligence. Id. at 24. Further, SWK asserts that there is also no right to rely when two sophisticated parties are negotiating at arms length and the plaintiff should have protected his own interest and that Oakwood was aware of the potential for cost overruns long before the period of the alleged nondisclosure. Id. Finally, SWK argues that there can be no liability based on alleged false predictions of future events if not false when made. Id. at 24–25. SWK argues that Oakwood's claim comes down to the fact that SWK allegedly failed to deliver on its agreement to install Acumatica ERP at an acceptable price within an acceptable timeframe, but these representations are not actionable because they are future predictions that did not come true and alleged failure to perform under a contract. Id. at 25. The court ultimately declines to reach these arguments because, as explained above, the court finds SWK's latest motion as a successive summary judgment motion.

because Oakwood realleges its allegations for fraud and negligent misrepresentation and fraud in the inducement in its second amended complaint after the court already granted summary judgment on these causes of action, SWK urges the court to reassert its dismissal of these claims. Id. at 2.

During the first hearing on the pending motions, Oakwood conceded that the court has already dismissed its causes of action for fraud and negligent misrepresentation and fraud in the inducement. Tr. 20:14–21:12. The court agrees with both SWK and Oakwood that it has already granted summary judgment on these causes of action. See SWK, ECF Nos. 67; 86; 98. The court therefore grants SWK's motion for partial summary judgment on these two causes of action (except, as described below, to the extent Oakwood alleges a claim for fraudulent nondisclosure).

As for SWK's argument on Oakwood's claim for fraudulent nondisclosure, the court finds that SWK's motion is an impermissible successive summary judgment motion. "[N]o federal litigant has an absolute right to bring multiple, piecemeal motions for summary judgment." Essex Ins. Co. v. Foley, 827 F. Supp. 2d 1326, 1329 n.2 (S.D. Ala. 2011). "Indeed, 'it sets bad precedent to allow parties to file serial motions for summary judgment' because repetitive motion practice undermines both the Court's and the parties' interests in efficiency and finality." Wootten v. Commonwealth of Va., 2016 WL 4742336, at *3 (W.D. Va. Sept. 12, 2016) (quoting Woodson v. Aspen Power, LLC, 2014 WL 11512251, at *2 (E.D. Tex. July 3, 2014)). Whether to consider a successive summary judgment motion is committed to the district court's discretion, and courts in this circuit, including this court, have routinely denied such motions on this ground. See, e.g., id. at *3–4 (denying a party's motion for partial summary judgment when the party

had previously filed several motions for summary judgment or motions functionally

seeking summary judgment); <u>Vivos Acquisitions, LLC v. Health Care Res. Network,</u>

<u>LLC</u>, 2022 WL 18671064, at *1–2 (E.D. Va. Oct. 26, 2022); <u>White v. Date Trucking,</u>

<u>LLC</u>, 2018 WL 11469493, at *1–2 (D. Md. July 20, 2018); <u>Mey v. Venture Data, LLC</u>,

2017 WL 10398567, at *1 (N.D.W. Va. July 6, 2017); <u>see also</u> <u>Brown v. United States</u>,

2025 WL 642115, at *5–6 (D.S.C. Feb. 27, 2025).

It is somewhat inaccurate for SWK to claim that "[t]he court did not previously

rule upon Oakwood's claim that SWK allegedly <u>violated</u> [a] duty or the remaining

elements of a fraud by nondisclosure claim." <u>SWK</u>, ECF No. 176 at 7. In its June 2022

Order, the court found that "Oakwood ha[d] provided sufficient evidence of a material

nondisclosure." <u>SWK</u>, ECF No. 67 at 21. Specifically, Oakwood had pointed to emails

and deposition excerpts indicating that SWK learned about its inability to provide the

multiple pick list customization but failed to disclose it. <u>Id.</u> Similarly, in its February

2023 Order, the court stated that it was reserving the issue of whether SWK breached its

duty to disclose for trial, and the court specifically noted that "[t]his includes deciding

whether there were material facts that could not have been discovered by the plaintiff,

despite its diligence." <u>SWK</u>, ECF No. 98 at 14. Therefore, in its prior orders, the court

determined that there is a genuine issue of material fact precluding summary judgment on

Oakwood's fraudulent nondisclosure claim, and the court declines to reassess that

finding. The court denies the portion of SWK's motion for partial summary judgment

directed at Oakwood's claim for fraudulent nondisclosure for this reason.

**B. Acumatica's Motion**

Acumatica moves for summary judgment on each of Oakwood's causes of action

and, like SWK, argues that its SCUTPA liability is limited under its own contractual

terms.  SWK, ECF No. 162.  Before delving into these arguments, the court briefly

pauses to explain the agreements between Oakwood and Acumatica.

Oakwood licensed Acumatica ERP through the Order Form.  See SWK, ECF

Nos. 162-2, Lena Decl. ¶ 3; id. at 5–6 (Order Form); 192-1, Butler Decl. ¶ 2.  According

to Butler's declaration, Powell emailed the Order Form to Koger, who signed it on

Butler's behalf after Oakwood reviewed its contents.  Butler Decl. ¶¶ 4–5, 7.  The Order

Form is only two pages.  See SWK, ECF No. 162-2 at 5–6.  On the second page, there is

a paragraph incorporating Acumatica's End User License Agreement ("EULA") and

providing a link for where the EULA can be found online:

> You acknowledge and agree that you have read, understand, and agree to
> be bound by the Acumatica End User License Agreement, as well as any
> other applicable agreements found at www.acumatica.com/agreements,
> which are incorporated herein, for the produces [sic], modules, options,
> subscriptions, and services listed on this order form, and any renewals
> thereof.  The products, modules, options, services, and subscriptions may
> be updated or amended by subsequent order form(s).  Except as otherwise
> provided on this order form, each order form is non-cancellable and shall
> be subject to Acumatica's End User License Agreement, as well as any
> other applicable agreements.

Id. at 6.

Notably, the EULA includes the following provisions limiting Acumatica's

damages and liability:

> **8.1 Limitation on Damages.** Except for a breach of Section 3, in no event
> shall either party be liable to the other or any other party for any indirect,
> incidental, consequential, special, exemplary, or punitive damages or lost
> profits, even if advised of the possibility of such damages.

> **8.2 Limitation on Liability.** Except for Acumatica's indemnification
> obligations pursuant to Section 6, Acumatica's cumulative liability to you,
> your Affiliates, or any other party for any loss or damages resulting from
> any claims, demands, or actions arising out of or relating to this Agreement
> shall be limited (i) in the case of a Perpetual License, to the Fees received
> by Acumatica for the Software prorated over a five (5) year term
> commencing with the date your Perpetual License commenced pursuant to

Section 5.1, or (ii) in the case of a Subscription License to the Fees received by Acumatica for the last twelve (12) months. This limitation applies to all causes of action or claims in the aggregate, including, without limitation, breach of contract, breach of warranty, indemnity, negligence, strict liability, misrepresentation, and other torts.

Id. at 16 (emphasis omitted).[15]

---

[15] The EULA also includes the following choice of law provision electing Washington law:

**10.2 Governing Law and Choice of Forum.** This Agreement shall be governed by and interpreted in accordance with the laws of the State of Washington, without regard to its conflicts of law rules.

SWK, ECF No. 162-2 at 17. This has generated a great deal of confusion in the parties' filings.

Acumatica acknowledges the potential choice of law issue in its memo in support of its motion for summary judgment but quotes an entirely different choice of law clause:

**11.7 Governing Law; Waiver of Jury Trial.** This Agreement shall be governed by and interpreted in accordance with the laws of the State of Washington, USA, without regard to its conflicts of law rules. Any claim or dispute arising in connection with this Agreement shall be resolved in the federal or state courts situated in the State of Washington.

SWK, ECF No. 162-1 at 7. The clause quoted by Acumatica does not appear in the copy of the EULA provided to the court as an exhibit to Lena Joseph's declaration. SWK, ECF No. 162-2 at 8–18; see also id., Joseph Decl. ¶ 4 ("A true and correct copy of the EULA is attached hereto as Exhibit 2.").

Putting aside this curious discrepancy, Acumatica does not argue whether the EULA's choice of Washington law applies to Oakwood's claims in this case and, instead, argues that the claims fail under either Washington or South Carolina law. SWK, ECF No. 162-1 (citing to both Washington and South Carolina law throughout). In response, Oakwood argues that its claims are governed by South Carolina law and does not cite to Washington authorities. SWK, ECF No. 170. Following suit, Acumatica does not acknowledge the choice of law issue in its reply and cites exclusively to South Carolina law throughout that filing. SWK, ECF No. 177. When the court asked about the issue during the hearing, Acumatica explained that Washington law and South Carolina law are identical in all relevant respects, Tr. 28:21–59:6, and though Oakwood did not directly address choice of law, Oakwood appeared to agree that Washington law and South Carolina law are not meaningfully different on the issues in this case, see Tr. 79:16–25 (Oakwood arguing about circumstances giving rise to a negligence claim "under South Carolina law, or under the Washington state law").

After the hearings, the court granted Oakwood leave to supplement its filings specifically to address whether the EULA limits its possible recovery from Acumatica

Turning to Acumatica's motion for summary judgment, the court will take each of Oakwood's causes of action in turn, starting with its SCUTPA claim, and will conclude by examining whether Acumatica's liability is limited by the EULA's liability limitation provision. Ultimately, the court grants summary judgment on Oakwood's SCUTPA claim to the extent Oakwood brings this claim based on Acumatica's direct liability but denies summary judgment on this claim to the extent Oakwood seeks to hold Acumatica vicariously liable. The court also grants summary judgment on Oakwood's causes of action for negligence, recission, and unjust enrichment. Finally, the court grants the motion in part with respect to whether the EULA limits Acumatica's liability but denies without prejudice a portion of Acumatica's argument on this issue so that the court can revisit those questions in post-trial motions if necessary.

### 1. Oakwood's SCUTPA Claim Against Acumatica

The parties spent much of their arguments at the hearings debating whether Oakwood asserts its various causes of action against Acumatica under a direct liability

---

under the SCUTPA. As explained above, Oakwood then filed two different supplements on the question. See supra note 6; Acumatica, ECF Nos. 122; 124. In the first of these supplements, Oakwood notes that the EULA includes a choice of law provision but that the Order Form does not include a choice of law provision, but Oakwood does not explain the legal significance of this observation. Acumatica, ECF No. 122 at 2 n.1. Instead, Oakwood cites to both Washington and South Carolina authorities in its first supplement but relies primarily on Washington law. See id. In its second supplement on the same issue, Oakwood does not acknowledge the choice of law issue but fails to cite to any South Carolina authorities. See Acumatica, ECF No. 124. In its supplemental reply, Acumatica also does not cite to any South Carolina authorities but argues that South Carolina law and Washington law are "substantially similar" on the liability limitation issue. Acumatica, ECF No. 127 at 2. In short, because the parties generally agree that Washington law and South Carolina law are the same on the issues at hand, the outcome of this case will be the same no matter which state's law the court applies. See Hay v. Barclays Bank Del., 2020 WL 9718810, at *3 n.2 (D.S.C. July 7, 2020).

theory, a vicarious liability theory, or both.[16]   See, e.g., Tr. 58:3–8, 63:13–64:7, 71:13–
72:25.  Oakwood clarified that it asserts its SCUTPA claim, as well as its negligence
claim which the court will discuss next, under both direct and vicarious liability theories.
Tr. 71:13–72:25, 80:1–2; see also Acumatica, Compl. ¶¶ 5, 47, 53, 60, 72.  Both theories
are generally based on its allegations about the relationship between Acumatica and
SWK.

SWK was one of Acumatica's "Gold Certified" Value Added Reseller ("VAR")
partners.  Acumatica, ECF No. 103-3, Acumatica 30(b)(6) Depo. at 106:24–107:14.  In
general, Acumatica uses its VAR partners to sell and implement Acumatica ERP.  See
Acumatica, ECF No. 103-1 (Acumatica Partner Program Guide).  To become a VAR
partner organization, Acumatica requires that organization's employees to go through
training, during which the employees earn a series of badges.  Id. at 5.  Acumatica has
various certification tiers for its partners, which are based on the badges held by
employees.  Id.  Partner organizations must achieve and maintain Gold Certification to
sell or implement Acumatica ERP.  Id.  In addition to the various training requirements,
Acumatica also tracks its VAR partners' customer satisfaction through the use of
Customer Satisfaction Scores ("CSAT").  Id. at 29.  CSAT scores are based on surveys
that Acumatica sends to the partners' customers twice per year.  Id.  Acumatica requires
that its partners receive adequate scores on the CSAT surveys, and failure to meet the

---

[16] Under South Carolina law, vicarious liability "is not itself a cause of action;
rather, it is a theory under which tort may be premised with respect to allocating
liability."  See Wilson v. S.C. L. Enf't Div., 2023 WL 6638989, at *4 n.6 (D.S.C. July 31,
2023), report and recommendation adopted as modified, 2023 WL 6172250 (D.S.C. Sept.
22, 2023), appeal dismissed 2024 WL 1752082 (4th Cir. Apr. 2, 2024).

minimum required score on two consecutive CSAT surveys could result in termination of the partner agreement. Id.

Oakwood principally points to evidence suggesting that Acumatica was aware that SWK was not providing quality customer service and may have been failing to meet its obligations to remain a VAR partner as a result. Diana Bowers ("Bowers") was one of Acumatica's Customer Success Managers. See Acumatica, ECF No. 103-10, Bowers Depo. at 10:17–19. She testified that she was aware of customer complaints regarding SWK, some of which had to do with customers being dissatisfied with SWK's communication or project delays. See Bowers Depo. 29:10–35:8. She also testified that some of SWK's customers requested to be changed to different Acumatica partners. Id. at 38:5–18.

Additionally, at some point in 2018, Acumatica sent Buddecke a letter to inform him that SWK had received a CSAT score well below the required minimal score.[17] See Acumatica, ECF No. 103-11 at 2. The letter went on to say that if SWK did not improve its score by the next survey in April 2019,[18] SWK would be out of compliance and would temporarily lose its certification status. Acumatica, ECF No. 103-11 at 2. In November 2019, Acumatica sent Buddecke a letter to inform him that SWK failed to meet the CSAT requirements in another survey. Acumatica, ECF No. 103-14. However, the letter went

---

[17] SWK had received a score of 13% but was required to receive at least 75%. Acumatica, ECF No. 103-11 at 2. However, it is worth noting that only eight of forty-three customers responded to this particular survey. Id.

[18] The record is not clear on what the results were from the following CSAT survey in April 2019. While those results are not included in the record, email correspondences between Acumatica and SWK employees from April 2019 suggest SWK failed to meet the required CSAT score for a second time. See Acumatica, ECF No. 103-13 at 3.

on to explain that Acumatica planned to alter the method it used to assess CSAT compliance in 2020, and Acumatica decided to make an exception for SWK and apply the new method to the November 2019 survey. Id. When the results were recalculated using the new method, SWK passed and was, therefore, in compliance with the VAR program. Id. Despite Acumatica being aware of SWK's customer complaints and low CSAT scores, Acumatica named SWK its "Partner of the Year" in 2018, 2019, and 2023. Acumatica, ECF No. 103-15.

### a. Direct Liability

Initially, Acumatica argues that the court should grant summary judgment on Oakwood's SCUTPA claim for three reasons. First, Acumatica argues that it did not advertise Acumatica ERP to Oakwood as being capable of meeting its unique business needs and that, if such promises were made, those promises were made by SWK, not Acumatica. Acumatica, ECF No. 90-1 at 23. Thus, Acumatica argues that there is no evidence that it engaged in deceptive or unfair business practices. Id. at 22–23. Second, Acumatica argues that there is no evidence that Acumatica ERP caused Oakwood damages. Id. at 23. Rather, Acumatica contends that Oakwood's alleged damages were caused by SWK's failed implementation of Acumatica ERP. Id. Third, Acumatica argues that having other dissatisfied customers does not establish a pattern and practice that can be repeated as required by SCUTPA. Id. at 24–25.

In response, Oakwood clarifies that its theory of recovery is based on Acumatica's designation of SWK as a partner. Oakwood points to the evidence that Acumatica had quality control methods to assess its "partners." Acumatica, ECF No. 98 at 10. Yet, despite SWK allegedly failing to meet these standards, Oakwood notes that

34

Acumatica continued to hold SWK out as a "Gold Certified Partner," implying that SWK was knowledgeable and capable of implementing Acumatica ERP. Id. Oakwood argues that a jury could find that this designation was intended to deceive customers. Id. at 11.

In reply, Acumatica contends that South Carolina law requires a causal connection between the plaintiff's loss and the alleged unfair or deceptive act. Acumatica, ECF No. 105 at 5. According to Acumatica, it did not cause SWK's alleged failures to customize Acumatica ERP, and the EULA specifically disclaims liability for SWK's purported failure. Id. at 6. Acumatica also replies by arguing that Oakwood has not demonstrated that any of the other dissatisfied customers complained of having been misled into engaging SWK based on SWK's status with Acumatica. Id. at 8. Thus, Acumatica argues that Oakwood's allegations about the other customer's experiences are speculatory, meaning they are insufficient to establish the public impact element. Id. at 6–8.

The court agrees with Acumatica. Notably, Acumatica's designation of SWK as a "partner," or even a "Gold Certified Partner," is not misleading, and no reasonable jury could find otherwise. If anything, calling SWK a "partner" is merely a claim that Acumatica and SWK work together and have some sort of relationship with one another, which is certainly true and does not create any tendency to deceive. After all, the term "partner" does not, by itself, denote competence.[19] See, e.g., Partner, Black's Law

---

[19] It is true that Acumatica had some internal quality control standards over its "partners," and perhaps Acumatica even believed, itself, that this was conveying some sense of quality to its customers. See Acumatica 30(b)(6) Depo. at 106:24–108:25. However, claims that an agent did a good job when the agent was, in fact, incompetent or negligent, are not actionable as deceptive practices under the SCUTPA. See Clarkson, 761 F.2d at 191 (explaining that a company's claim that its employee performed its job properly was not a deceptive practice when the plaintiff showed that the employee

Dictionary (12th ed. 2024) (offering various definitions of "partner" based on the relationship between two or more persons or entities); Partner, Merriam-Webster, https://www.merriam-webster.com/dictionary/partner (last visited Mar. 26, 2025) (same); Partner, Dictionary.com, https://www.dictionary.com/browse/partner (last visited Mar. 26, 2025) (same).

Beyond that, even if the term "partner" were somehow potentially deceptive, there is no evidence to suggest that Acumatica's use of this term caused Oakwood's damages in this case. Instead, to the extent Oakwood considered Acumatica's designation of SWK as a partner when licensing Acumatica ERP, Oakwood's understanding of this term was merely that SWK and Acumatica worked together in selling Acumatica ERP, which again was both true and not deceptive. See Oakwood 30(b)(6) Depo. at 60:6–16 (explaining Oakwood's understanding that SWK's employees "represent Acumatica," meaning: "They are your partner. You have a contract with them to sell your product."). Oakwood's SCUTPA claim against Acumatica under a direct liability theory fails for these reasons. See S.C. Code Ann. § 39-5-140(a) (requiring that a plaintiff suffer a loss "as a result of the use or employment by another person of an unfair or deceptive method" to prevail on a SCUTPA claim); Clarkson, 761 F.2d at 190–

---

performed his job negligently or incompetently). What is more, Oakwood has not presented any evidence to suggest that any of SWK's customers were aware of the quality control standards or would have believed the term "partner" to convey some claim about SWK's competence.

Beyond that, even if the customers were aware of the existence of these standards, Oakwood has not presented evidence showing that SWK's customer service issues necessitated Acumatica terminating its partnership. Oakwood makes much of the fact that Acumatica had multiple failing CSAT surveys, but the Acumatica Partner Program Guide merely states that being out of compliance with two consecutive CSATs "could result [in] possible termination of the Partner Agreement." Acumatica, ECF No. 103-1 at 29 (emphasis added).

91 (finding insufficient evidence in the record to support a plaintiff's SCUTPA claim when the plaintiff had failed to present evidence showing a deceptive practice or causation); State ex rel. Wilson v. Ortho-McNeil-Janssen Parms., Inc., 777 S.E.2d 176, 189 (S.C. 2015) ("SCUTPA . . . requires a causal connection between the injury-in-fact and the complained of unfair or deceptive acts or practices."). Therefore, the court grants summary judgment on Oakwood's SCUTPA claim against Acumatica to the extent it is asserted on a direct liability theory.

### b. Vicarious Liability

Acumatica asserts that courts in other jurisdictions have held that statutes comparable to the SCUTPA do not permit vicarious liability. Acumatica, ECF No. 90-1 at 25–26. Thus, Acumatica contends that it cannot be held vicariously liable for SWK's alleged SCUTPA violations. Id. In response, Oakwood notes that no South Carolina court has ever ruled that the SCUTPA does not apply to vicarious liability, and Oakwood argues that there is a genuine issue of material fact as to whether Acumatica held SWK out as its agent, such that Acumatica could be vicarious liable for SWK's conduct. Acumatica, ECF No. 98 at 13–15.

A different court in this district was recently determined that any entity can be vicarious liable for an agent's SCUTPA violation. Nautilus Ins. Co. v. Murdaugh, 2024 3042815, at *8 (D.S.C. June 18, 2024). This court follows suit and finds that Oakwood may pursue its SCUTPA claim against Acumatica on a vicarious liability theory and proceeds to consider whether summary judgment should be granted on this claim under this theory.

A principal can generally be liable for the tortious conduct of its agent. See Reynolds v. Witte, 13 S.C. 5, 16 (1880). "The proper inquiry is, whether the act was done in the course of the agency and by virtue of the authority as agent." Id. Whether the essential agency relationship exists, and the extent of the agent's authority, is a question of fact under South Carolina law. See Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd., 944 F.3d 225, 237 (4th Cir. 2019). "If there are any facts tending to prove the relationship of agency, it then becomes a question for the jury." Gathers v. Harris Teeter Supermarket, Inc., 317 S.E.2d 748, 752 (S.C. Ct. App. 1984).

The "agency relationship can be proven 'by evidence of actual [authority] or apparent authority." Hub, 944 F.3d at 237. Under South Carolina law, "actual authority [must be] expressly conferred upon the agent by the principal." Id. Apparent authority "can exist where 'the principal knowingly permits the agent to exercise authority, or the principal holds the agent out as possessing such authority.'" Id.

A reasonable jury could find the existence of an agency relationship between Acumatica and SWK. To reiterate, Acumatica holds SWK out as its "Gold Certified Partner." Acumatica 30(b)(6) Depo. at 106:24–107:14. Beyond that, Acumatica uses its partners to enter into licensing agreements on its behalf, and Acumatica exerts a great deal of authority over its partners by requiring employees to complete training and maintain certain customer service standards, as described previously. Id. at 213:13–214:8; Acumatica, ECF No. 103-1. Consequently, the court finds that there is a genuine issue of material fact over the existence of an agency relationship between Acumatica and SWK, and the court denies Acumatica's motion for summary judgment on Oakwood's SCUTPA claim under a vicarious liability theory for this reason.

38

## 2. Oakwood's Claim for Negligence Against Acumatica

Acumatica argues a negligence claim cannot stand if the only duty owed to the plaintiff is the duty to act under a contract. Acumatica, No. 90-1 at 16. Acumatica contends that the EULA governs the relationship between itself and Oakwood and that the EULA specifically disclaims any additional duty or representations apart from its obligations in that agreement. Id. at 17. Moreover, the EULA specifically disclaims liability for any customizations promised by a third party. Id.

In response, Oakwood argues that Acumatica owed Oakwood a duty of care with respect to the Acumatica ERP sold to Oakwood and that Acumatica breached that duty when it used SWK to sell its product despite knowing that SWK was incompetent and unqualified to do so. Acumatica, ECF No. 98 at 16–17.

In reply, Acumatica first accuses Oakwood of misstating the record. Acumatica, ECF No. 105 at 2–5. In general, while Acumatica concedes that SWK had its share of dissatisfied customers, Acumatica argues that the record does not support Oakwood's contention that SWK was grossly incompetent. Id. Moreover, Acumatica argues that Oakwood's only theory of duty is that a duty arose out of an agency relationship between Acumatica and SWK. Id. at 8–9. However, Acumatica argues that Oakwood has not pled an agency relationship and has not pointed to evidence demonstrating the existence of an agency relationship. Id. at 9. Finally, Acumatica also argues that, even if Oakwood could establish a duty, Oakwood has not sufficiently shown that its alleged losses were caused by the relationship between Acumatica an SWK. Id. at 10.

"A breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie. A breach of a duty

39

arising independently of any contract duties between the parties, however, may support a tort action." Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc., 463 S.E.2d 85, 88 (S.C. 1995). For this reason, a negligence action will normally not lie when parties are simply in privity of contract unless the parties have a special relationship with one another that gives rise to a duty. Id. "A buyer-seller relationship does not constitute a 'special relationship' . . . ." Laidlaw Env't Servs., (TOC), Inc. v. Honeywell, Inc., 966 F. Supp. 1401, 1414 (D.S.C. 1996), aff'd, 113 F.3d 1232 (4th Cir. 1997).

The court agrees with Acumatica that Oakwood has not presented any evidence of a duty existing outside of its contractual relationship with Acumatica. Tommy L. Griffin, 463 S.E.2d at 88. Likewise, to the extent Oakwood alleges that Acumatica is vicariously liable for the alleged negligence of SWK, this theory fails for the same reason— Oakwood has failed to produce evidence showing a pre-existing duty owed by SWK to Oakwood outside of the contractual agreements between those parties. See id. Therefore, the court grants summary judgment on Oakwood's negligence claim against Acumatica.

### 3. Oakwood's Claim for Rescission Against Acumatica

"Rescission is an equitable remedy that attempts to undo a contract from the beginning as if the contract had never existed." Mortg. Elec. Sys., Inc. v. White, 682 S.E.2d 498, 502 (S.C. Ct. App. 2009). "A breach of contract claim warranting rescission of the contract must be so substantial and fundamental as to defeat the purpose of the contract." Brazell v. Windsor, 682 S.E.2d 824, 826 (S.C. 2009). The "right of rescission exists in three cases: (1) [w]here the right to return the property is a part of the original

contract; (2) where there is fraud; [or] (3) where there has been an entire failure of consideration." Eureka Elastic Paint Co. v. Bennett-Hedgpeth Co., 67 S.E. 738, 740 (S.C. 1910).

Oakwood alleges it was induced by Acumatica into believing that SWK was competent, and rescission of the Order Form is appropriate because Oakwood received no benefit from the Order Form and the fundamental purpose of the Order Form was defeated. Acumatica, Compl. ¶¶ 73–81. Acumatica urges the court to grant summary judgment on Oakwood's cause of action for rescission primarily because recission is an equitable remedy for a breach of contract claim, meaning Oakwood cannot pursue rescission as a stand-alone cause of action. Acumatica, ECF No. 90-1 at 18–19. Acumatica further contends that, even if Acumatica had breached the Order Form (which it argues it has not and notes that Oakwood has made no such claim), an incidental breach of contract is not enough to justify rescission. Id. at 19–20.

In response, Oakwood first argues that the question of "[w]hether Acumatica's breach of the [Order Form] was so substantial and fundamental as to justify rescission is a question of fact that precludes summary judgment." Acumatica, ECF No. 98 at 18. In other words, Oakwood's response assumes that Acumatica breached the Order Form. SWK, ECF No. 170 at 18. Yet Oakwood does not bring a cause of action for breach of contract against Acumatica. See Acumatica, Compl. Likewise, even if it had pled a breach of contract cause of action against Acumatica, Oakwood does not point, in its response, to any provision in the Order Form that Acumatica allegedly breached. See Acumatica, ECF No. 98. Instead, Oakwood argued, for the first time during the hearing,

that rescission is appropriate because Acumatica allegedly breached the implied covenant of good faith and fair dealing in the Order Form. Tr. 76:1–78:15.

     To the extent rescission is a cause of action, the court is skeptical of Oakwood's implication that it can plead rescission as a stand-alone claim without also bringing a breach of contract claim, and the court is not sure what a rescission claim would look like under that circumstance.[20] Regardless, the court need not resolve that question in this order. In essence, Oakwood is seeking to amend its allegations via arguments made in its response and at the hearing to include an unpled breach of contract claim under the guise of its nebulous rescission claim, and the court is certainly not going to allow that. See Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp., 455 F. Supp. 2d 399, 435 (D. Md.

---

[20] To Acumatica's point, rescission is a remedy, Mortg. Elec. Sys., Inc., 682 S.E.2d at 502 ("Rescission is an equitable remedy that attempts to undo a contract from the beginning as if the contract had never existed."); see also Brazell, 682 S.E.2d at 826 ("A breach of contract claim warranting rescission of the contract must be so substantial and fundamental as to defeat the purpose of the contract." (emphasis added)), but some South Carolina courts have, at times, also described rescission as a cause of action, see, e.g., Herndon v. Wright, 184 S.E.2d 444, 446 (S.C. 1971) ("We are of the opinion that the allegations of plaintiff's complaint are sufficient to state a cause of action for rescission under this doctrine."); Warr v. Carolina Power & Light Co., 115 S.E.2d 799, 804 (S.C. 1960) ("Obviously, whether a misrepresentation as to the intended use of the property will give rise either to a cause of action for rescission or to one for fraud and deceit must depend upon the materiality of the representation in the circumstances of the particular case."); Page v. Lewis, 26 S.E.2d 569, 571 (S.C. 1943) ("The principle has been announced in cases too numerous to cite that causes of action for rescission or cancellation of a deed or contract for fraud descends to the heirs if they existed in the ancestor unimpaired at the time of his death."); Anderson Cnty. v. Preston, 804 S.E.2d 282, 297 (S.C. Ct. App. 2017) ("A cause of action seeking rescission and damages assumes a valid contract, whereas one attacking the contract as void assumes no contract existed."), vacated 831 S.E.2d 911 (S.C. 2019). Nevertheless, the court need not resolve that question of state law in this order.

2006) ("A plaintiff may not amend its complaint through arguments at the summary judgment stage.").[21]

Oakwood argues that rescission is appropriate because the Acumatica ERP Oakwood received was unusable. Acumatica, ECF No. 98 at 18–19. Yet, in the Order Form, Oakwood contracted with Acumatica for Acumatica to license Acumatica ERP to Oakwood. See Acumatica, ECF No. 162-2 at 5–6. Even if SWK later failed at customizing Acumatica ERP to meet Oakwood's needs, there is no evidence to suggest that Oakwood did not receive the very license it contracted for in the Order Form. Thus, there is no evidence of a failure of consideration, and the court grants summary judgment on Oakwood's rescission claim against Acumatica accordingly.

### 4. Oakwood's Claim for Unjust Enrichment Against Acumatica

"Unjust enrichment is an equitable doctrine which permits the recovery of that amount the defendant has been unjustly enriched at the expense of the plaintiff." Dema v. Tenet Physician Servs.-Hilton Head, Inc., 678 S.E.2d 430, 434 (2009). To succeed on an unjust enrichment claim, a plaintiff must prove: "(1) [a] benefit conferred by plaintiff upon the defendant; (2) realization of that benefit by the defendant; and (3) retention of the benefit by the defendant under circumstances that make it inequitable for him to retain it without paying its value." Myrtle Beach Hosp., Inc. v. City of Myrtle Beach, 532 S.E.2d 868, 872 (2000). "The South Carolina Supreme Court defined benefits as 'goods or services.'" Quintech Sec. Consultants, Inc. v. Intralot USA, Inc., 2011 WL 5105446, at *4 (D.S.C. Oct. 27, 2011) (citing Gignilliat v. Gignilliat, Savitz & Bettis,

---

[21] Reading new claims into a plaintiff's complaint is not proper at the summary judgment stage because, by that point, discovery has already concluded. See Sensormatic, 455 F. Supp. 2d at 436.

L.L.P., 684 S.E.2d 756, 764 (S.C. 2009)).  The plaintiff may not recover under unjust

enrichment if the tasks the plaintiff is seeking compensation for under quantum meruit

are encompassed within the terms of an express contract which has not been abandoned

or rescinded.  Paul L. Kennedy Enters., Inc. v. Manganaro Se., LLC, 2023 WL 1420030,

at *3 (D.S.C. Jan. 31, 2023) (citing Swanson v. Stratos, 564 S.E.2d 117, 120 (S.C. Ct.

App. 2002)).

       Acumatica argues that South Carolina law does not permit an unjust enrichment

claim when there is an express contract between the parties.  Acumatica, ECF Nos. 90-1

at 20–21; 105 at 11.  Moreover, even if Oakwood could pursue an unjust enrichment

claim, Acumatica argues it would still fail because Acumatica provided the exact product

contracted for in the EULA, and Oakwood alleges only that SWK failed to properly

customize the Acumatica ERP.  Acumatica, ECF No. 90-1 at 21.  In response, Oakwood

argues that "there are genuine issues of material fact as to whether the value of the

software was substantially impaired by delays due to SWK's lack of technical proficiency

in implementing the software and ultimate failure to complete deployment [sic] of the

software."  Acumatica, ECF No. 98 at 20.  Because Oakwood retained a benefit from

Acumatica's agent's sale of Acumatica ERP to Oakwood, Oakwood argues that it has

stated a claim.  Id.

       The court grants summary judgment on Oakwood's unjust enrichment claim

because, as Acumatica argues, a plaintiff may not recover under unjust enrichment if the

tasks the plaintiff is seeking compensation for under quantum meruit are encompassed

within the terms of an express contract which has not been abandoned or rescinded,

Swanson, 564 S.E.2d at 120, and Oakwood has offered no argument on why its

contractual relationship with Acumatica would not bar its unjust enrichment claim, see

Acumatica, ECF No. 98 at 20.  Beyond that, as explained in the previous section of this

order, there is no evidence that Oakwood did not receive a license for Acumatica ERP—

the very thing Oakwood contracted for in the Order Form.  Thus, the court grants

Acumatica's motion for summary judgment on Oakwood's claim for unjust enrichment.

### 5.  Liability Limitations

In relevant part, the EULA provides:

> **8.1 Limitation on Damages.** Except for a breach of Section 3, in no event
> shall either party be liable to the other or any other party for any indirect,
> incidental, consequential, special, exemplary, or punitive damages or lost
> profits, even if advised of the possibility of such damages.
>
> **8.2 Limitation on Liability.** Except for Acumatica's indemnification
> obligations pursuant to Section 6, Acumatica's cumulative liability to you,
> your Affiliates, or any other party for any loss or damages resulting from
> any claims, demands, or actions arising out of or relating to this Agreement
> shall be limited (i) in the case of a Perpetual License, to the Fees received
> by Acumatica for the Software prorated over a five (5) year term
> commencing with the date your Perpetual License commenced pursuant to
> Section 5.1, or (ii) in the case of a Subscription License to the Fees received
> by Acumatica for the last twelve (12) months. This limitation applies to all
> causes of action or claims in the aggregate, including, without limitation,
> breach of contract, breach of warranty, indemnity, negligence, strict
> liability, misrepresentation, and other torts.

Acumatica, ECF No. 90-2 at 16 (emphasis omitted).

Acumatica argues Sections 8.1 and 8.2 in the EULA that limit Oakwood's

remedies "to the Fees received by Acumatica for the last twelve (12) months."

Acumatica, ECF No. 90-1 at 26.  Thus, Acumatica contends that, if the court does not

grant summary judgment in full, the court should rule that Acumatica's potential liability

is capped at $69,513, the total sum in fees Acumatica has collected from Oakwood.  Id.

In its supplemental responses, Oakwood argues both there is a factual question over

whether the parties manifested assent to the liability limitations in the EULA and that

these provisions are unenforceable because they are unconscionable and violate public policy.  See Acumatica, ECF Nos. 122; 124.  Acumatica replies by arguing that there is no factual question over whether the parties manifested an intent to be bound by the EULA and its liability limitation clause and that the provision is enforceable.  Acumatica, ECF No. 127.  Much like it did with the analogous provisions in SWK's MSA, the court will address whether there is a genuine issue of material fact over whether the parties manifested an intent to agree to these provisions but reserves the legal questions of the enforceability of these provisions for post-trial motions.

"Washington follows the objective manifestation theory of contract interpretation, under which courts attempt to ascertain the intent of the parties 'by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties.'"  William G. Hulbert, Jr. & Clare Mumford Hulbert Revocable Living Tr. v. Port of Everett, 245 P.3d 779, 784 (Wash. Ct. App. Div. 1 2011) (quoting Hearst Commc'ns Inc. v. Seattle Times Co., 115 P.3d 262, 267 (Wash. 2005)).  Thus, courts look to "the outward manifestations of intent by a party to enter into a contract [and] impute an intention corresponding to the reasonable meaning of a person's words and acts.  If the offeror, judged by a reasonable standard, manifests an intention to agree in regard to the matter in question, that agreement is established."  City of Everett v. Sumstad's Est., 631 P.2d 366, 367 (Wash. 1981) (en banc) (citation omitted).  Parties may "incorporate contractual terms by reference to a separate . . . agreement to which they are not parties, and including a separate document which is unsigned."  W. Wash. Corp. of Seventh-Day Adventists v. Ferrellgas, Inc., 7 P.3d 861, 865 (Wash. Ct. App. Div. 2 2000) (alteration in original) (quoting Samuel Williston, The Law of Contracts

46

§ 30:25 (Richard A. Lord ed., 4th ed. 1999)).  "Incorporation by reference must be clear and unequivocal.  'It must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms[.]'"  Id. (alteration in original) (citation omitted) (quoting Williston, supra).

Oakwood argues that there is a genuine question of material fact over whether it manifested an intent to be bound by the EULA.  Acumatica, ECF No. 124 at 4–7.  It contends that the standardized Order Form does not evidence Oakwood's intent to be bound to "inconspicuous, one-sided liability limitations regardless of Acumatica's subjective intent." Id. at 7.  Oakwood makes much of the fact that SWK presented the Order Form on Acumatica's behalf without simultaneously presenting it with the EULA and the liability limiting provisions contained therein.  Id. at 6–7.  Oakwood also argues that it could not know what terms it was agreeing to in the Order Form because Acumatica retains the right to change the EULA at any time, that the Order Form's reference to the EULA is inconspicuous, and that the terms of Sections 8.1 and 8.2 are ambiguous because they do not specifically mention whether they apply to actions based on vicarious liability.  Acumatica, ECF No. 122 at 2–5.

The evidence in the record leads to only one conclusion—Oakwood objectively manifested an intent to be bound by the EULA.  First, the Order Form unambiguously incorporates the EULA by reference.  See Acumatica, ECF No. 90-2 at 6.  This is not a case in which the incorporation was buried in fine print.  The second page of the Order Form consists of only three paragraphs, with the third paragraph overtly acknowledging that Oakwood has read and agrees to be bound by the EULA and explaining where that agreement may be found online.  See id.  According to Butler, SWK sent Oakwood the

two-page Order Form via email, and Oakwood reviewed the document before signing

and returning it.  Butler Decl. ¶¶ 4–7.  Butler's signature appears on the Order Form

approximately one inch below the reference to the EULA.  See Acumatica, ECF No. 90-2

at 6.  By signing the Order Form, Oakwood objectively manifested an intent to be bound

to the EULA based on the "clear and unequivocal" language of the Order Form.  W.

Wash. Corp. of Seventh-Day Adventists, 7 P.3d at 865; Satomi Owners Ass'n v. Satomi,

LLC, 225 P.3d 213, 225 (Wash. 2009) (en banc) ("If the parties to a contract clearly and

unequivocally incorporate by reference into their contract some other document, that

document becomes part of their contract.").

Second, having determined that the EULA was incorporated into the Order Form,

the court now examines whether the liability limitation provisions in Sections 8.1 and 8.2

were conspicuous.  The question is whether these sections were "so inconspicuous that

reasonable persons could reach different conclusions as to whether the document was

unwittingly signed."  Johnson v. UBAR, LLC, 210 P.3d 1021, 1023 (Wash. Ct. App. Div.

1 2009).  Relevant factors include:

> whether the waiver is set apart or hidden within other provisions, whether
> the heading is clear, whether the waiver is set off in capital letters or in bold
> type, whether there is a signature line below the waiver provision, what the
> language says above the signature line, and whether it is clear that the
> signature is related to the waiver.

Id.; accord Puget Sound Fin., LLC v. Unisearch, Inc., 47 P.3d 940, 946–47 (Wash. 2002)

(en banc) ("Our considerations regarding the conspicuousness of the clause are the same

as 'whether the important terms were hidden in a maze of fine print . . . .'" (footnote and

citation omitted)).

The court finds that the liability limitations were conspicuous as a matter of law.

To reiterate, the Order Form has a signature line just below the reference to the EULA,

making clear that Oakwood is agreeing to be bound by the EULA.  See Acumatica, ECF No. 90-2 at 6.  Section 8 of the EULA begins with a bold heading, which reads "Limitation of Damages and Liability," and the text of this section is also in bold. Acumatica, ECF No. 90-2 at 16.  There is no question of what this section is, and it is not hidden amongst other provisions.  Thus, it is conspicuous as a matter of law.  See Johnson, 210 P.3d at 1023.

Third, the language of Sections 8.1 and 8.2 is not ambiguous.  While Oakwood may be correct that these sections do not specifically reference vicarious liability, the limitation on liability explicitly states that Acumatica's "cumulative liability . . . for any loss or damages resulting from any claims . . . shall be limited . . . ."  Acumatica, ECF No. 90-2 at 16 (emphasis added).  It further states that "[t]his limitation applies to all causes of action or claims in the aggregate, including, without limitation, breach of contract, breach of warranty, indemnity, negligence, strict liability, misrepresentation, and other torts."  Id. (emphasis added).  There is no question that this broad language unambiguously applies to the claims Oakwood asserts against Acumatica, and the court finds that Oakwood manifested an intent to be bound by the EULA as a matter of law. Relatedly, while Butler "understand[s]" that Acumatica changes the terms of the EULA, Butler Decl. ¶ 11, Oakwood has presented no evidence suggesting that Acumatica actually did change the liability limitations provision from the EULA from the time when Oakwood signed the Order Form.  "Further, Washington and Ninth Circuit courts have a history of enforcing contracts containing change-in-terms provisions."  Ekin v. Amazon Servs., LLC, 84 F. Supp. 3d 1172, 1176 (W.D. Wash. 2014).

There is therefore no genuine issue of material fact that the limitation of liability provision applies to Oakwood's claims. Because both parties agree that the question of whether this provision is enforceable to limit Acumatica's liability from treble damages under the SCUTPA is a question of law, the court reserves that question for post-trial motions.[22] <u>Acumatica</u>, ECF Nos. 122; 124; 127; <u>see also, e.g.</u>, <u>Maybank</u>, 787 S.E.2d at 517; <u>Fanczi Screw Co.</u>, 114 F. App'x at 551; <u>Dance</u>, 2008 WL 11349871, at *1.

## IV.   CONCLUSION

For the reasons set forth above, the court **GRANTS IN PART AND DENIES IN PART** SWK's motion for partial summary judgment and **GRANTS IN PART AND DENIES IN PART** Acumatica's motion for summary judgment.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 26, 2025**
**Charleston, South Carolina**

---

[22] In particular, the court notes that Oakwood argues in its first supplement that, based on the Washington Court of Appeals's reasoning in <u>Riley v. Iron Gate Self Storage</u>, 395 P.3d 1059, 1069 (Wash. Ct. App. Div. 2), the EULA would "seriously impair" its ability to recover treble damages under the SCUTPA and would therefore be enforceable because it violates public policy. <u>Acumatica</u>, ECF No. 122 at 5. Because this argument does not appear in Oakwood's second supplement on this issue, Acumatica did not respond to this argument. <u>See Acumatica</u>, ECF No. 127. By reserving this issue for post-trial motions, the court gives Acumatica the opportunity to address this issue and any other issue raised in either of Oakwood's supplements.