**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION**

| | | |
|---|---|---|
| OAKWOOD PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SWK TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | No. 9:20-cv-04107-DCN |
| | ) | |
| ACUMATICA, INC., | ) | |
| | ) | |
| Cross Claimant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SWK TECHNOLOGIES, INC., | ) | |
| | ) | |
| Cross Defendant. | ) | |
| | ) | |
| OAKWOOD PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 9:22-cv-01538-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| ACUMATICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

The following matter is before the court on seven post-trial motions in two

consolidated cases, <u>Oakwood Products, Inc. v. SWK Technologies Inc.</u>, No. 22-cv-

04107-DCN ("<u>SWK</u>"), and <u>Oakwood Products, Inc. v. Acumatica, Inc.</u>, No. 22-cv-

01538-DCN ("<u>Acumatica</u>").[1]  For the following reasons, the court denies defendant SWK

---

[1] Throughout this order, filings in <u>Acumatica</u>, No. 22-cv-01538-DCN will be cited
to as <u>Acumatica</u>, followed by the ECF filing number in that case, and filings in <u>SWK</u>, No.

Technologies, Inc.'s ("SWK") renewed motion for judgment as a matter of law, motion for new trial nisi remittitur, and/or motion for a new trial, SWK, ECF No. 262; denies defendant Acumatica, Inc.'s ("Acumatica") (together with SWK, "defendants") renewed motion for judgment as a matter of law, SWK, ECF No. 263; grants plaintiff Oakwood Products, Inc.'s ("Oakwood") motion to invalidate limited liability provisions as to its statutory remedies, SWK, ECF No. 259; grants Oakwood's motion for treble damages, SWK, ECF No. 258; grants Oakwood's motion for prejudgment interest, SWK, ECF No. 257; grants Oakwood's motion for attorney's fees, SWK, ECF No. 248; awards Oakwood's costs pursuant to its Bill of Costs, SWK, ECF No. 249; and denies without prejudice Acumatica's motion for judgment as a matter of law on its crossclaims, SWK, ECF No. 266.

## I.  BACKGROUND

### A.  Factual Background[2]

Both of these actions arise out of an ongoing dispute related to the now terminated business relationship between Oakwood, SWK, and Acumatica.  SWK is an information technology consulting company that provides enterprise resource planning, accounting software products, and related services.  It assists with the implementation of third-party software products, including Sage 500 and Acumatica ERP, which are business management software programs that assist companies with their accounting, supply

---

22-cv-04107-DCN will be cited to as SWK, followed by the ECF filing number in that case.

[2] The court dispenses with citations and provides this short explanation of the facts and allegations giving rise to this case for background purposes and to aid in understanding the court's reasoning.  The court ultimately bases its decision on the facts and portions of the record cited in the discussion section of this order.

chain, and other needs.  Acumatica is the developer of Acumatica ERP.  Acumatica has no sales force of its own, so it partners with companies like SWK and expressly licenses and permits them to market, license, sell, and implement its software products, including Acumatica ERP.

Oakwood is a South Carolina corporation that operates a fine organics manufacturing facility in North Estill, South Carolina.  On or around January 21, 2019, SWK and Oakwood entered into a Statement of Work ("SOW") in which SWK agreed to transition Oakwood's business management software from Sage 500 to Acumatica ERP.  The SOW was accompanied by a Master Services Agreement ("MSA"), which both parties signed on or around January 28, 2019.  Oakwood also contracted to receive a license for Acumatica ERP through an Acumatica Order Form ("Order Form"), which Oakwood signed on February 12, 2019.

According to Oakwood, SWK failed to identify and address several issues with the Acumatica ERP implementation in a suitable manner.  These alleged deficiencies included issues with the program speed and with its shipping and pricing features, which were crucial to Oakwood's business.  Oakwood also claims that SWK's project managers lacked certain technical proficiencies, causing a delay in the transition from Sage 500 to Acumatica ERP.  Fourteen months after the project start date, SWK had yet to complete the transition.  As a result, Oakwood hired a third-party vendor, TechRiver, LLC ("TechRiver"), to analyze the incomplete configuration of Acumatica ERP.  Based on TechRiver's recommendation, Oakwood ultimately decided to upgrade its Sage 500 software using TechRiver rather than complete the deployment of Acumatica ERP with SWK.

## B. Relevant Procedural History

On October 27, 2020, Oakwood filed a complaint against SWK in the Hampton County Court of Common Pleas, <u>SWK</u>, ECF No. 1-1, and on November 25, 2020, SWK removed the action to this court, <u>SWK</u>, ECF No. 1.  With leave of the court, Oakwood filed its second amended complaint, which is now the operative complaint, on July 6, 2022.  <u>SWK</u>, ECF No. 69, 2d Amend. Compl.  On May 13, 2022, Oakwood filed a complaint against Acumatica, asserting that Acumatica failed "to exercise appropriate control and failed to prevent SWK from marketing, licensing, selling, and implementing Acumatica's product in situations where it was unfeasible for use."  <u>Acumatica</u>, ECF No. 1, Compl. ¶ 3.  The parties agreed to consolidate the two cases on July 21, 2022.  <u>SWK</u>, ECF No. 72; <u>see also</u> <u>SWK</u>, ECF No. 260.[3]  On August 11, 2022, Acumatica filed crossclaims against SWK for (1) breach of contract/contractual indemnity, (2) equitable indemnification, and (3) contribution.  <u>SWK</u>, ECF No. 76, Cross-Cl.

In the years during which these cases have been pending, the court issued several orders granting partial summary judgment.  <u>See</u> <u>SWK</u>, ECF Nos. 40; 67; 86; 198.  In short, following the court's latest such order on March 26, 2025, Oakwood preserved the

---

[3] Initially, the parties had agreed to consolidate the two cases for purposes of discovery and trial.  <u>SWK</u>, ECF No. 72.  After the trial, the court ordered that the two cases be reconsolidated for consideration of the various post-trial motions.  <u>SWK</u>, ECF No. 260.  Unfortunately, the un-consolidation and reconsolidation of these cases after trial appears to have led to some technical issues in the two dockets.  For example, some of Oakwood's motions, such as its motion for prejudgment interest, appears twice on the SWK docket.  <u>See, e.g.</u>, <u>SWK</u>, ECF No. 257; 265.  There are also some filings that appear on the <u>Acumatica</u> docket but not the <u>SWK</u> docket and vice versa.  <u>See, e.g.</u>, <u>Acumatica</u>, ECF No. 198 (Oakwood's response in opposition to Acumatica's renewed motion for judgment as a matter of law filed only in the <u>Acumatica</u> docket).  To avoid confusion, the court will cite to the filings based on the ECF numbers corresponding with their first appearance on the <u>SWK</u> docket and will cite to the <u>Acumatica</u> ECF numbers only for those filings that do not appear on the <u>SWK</u> docket.

4

following claims against SWK for trial: (1) breach of contract, (2) fraudulent nondisclosure, (3) breach of warranty, and (4) violation of the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code Ann. § 39-5-10, et seq. See SWK, ECF No. 198 at 7–28.[4] Similarly, by virtue of the court's March 26, 2025 order, Oakwood's only claim against Acumatica remaining for trial was for vicarious liability based on SWK's SCUTPA violation. See SWK, ECF No. 198 at 28–50.

The court held a five-day trial from May 12, 2025, to May 16, 2025. SWK, ECF Nos. 237; 238; 240; 241; 243; see also SWK, ECF Nos. 252; 253; 254; 255, Tr. (trial transcript). The jury found SWK liable for breach of contract, breach of warranty, and violating the SCUTPA; found Acumatica vicariously liable for SWK's SCUTPA violation based on an agency relationship between Acumatica and SWK; and awarded $275,000 in damages. SWK, ECF No. 245. However, the jury found for SWK on Oakwood's fraudulent nondisclosure claim. Id. at 2.

Since the trial, all parties have filed an avalanche of new motions. On May 30, 2025, Oakwood moved for attorney's fees, SWK, ECF No. 248, and filed a bill of costs, SWK, ECF No. 249. On June 13, 2025, both SWK and Acumatica responded in opposition to Oakwood's motion for attorney's fees. SWK, ECF No. 256; Acumatica, ECF No. 187. Oakwood then replied to these responses on June 20, 2025. SWK, ECF No. 264; Acumatica, ECF No. 194.

---

[4] Oakwood also pled rescission as a separate cause of action against SWK, and that cause of action also survived the court's March 2025 summary judgment order. See SWK, ECF No. 198 at 7 n.7 (noting that SWK did not move for summary judgment on Oakwood's rescission claim). Nevertheless, Oakwood later withdrew its rescission claim against SWK at trial. See, ECF No. 253, Tr. at 539:9–12.

5

Oakwood then filed several additional post-trial motions on June 13, 2025. First, Oakwood moved for prejudgment interest. <u>SWK</u>, ECF Nos. 257. SWK and Acumatica responded in opposition to this motion on June 27, 2025, <u>SWK</u>, ECF Nos. 270; 273, and Oakwood replied on July 7, 2025, <u>SWK</u>, ECF No. 279. Second, Oakwood moved for treble damages. <u>SWK</u>, ECF No. 258. SWK and Acumatica responded in opposition to this motion on June 27, 2025, <u>SWK</u>, ECF Nos. 272; 274, and Oakwood replied on July 7, 2025, <u>SWK</u>, ECF No. 278. Third, Oakwood moved to invalidate defendants' limited liability provisions. <u>SWK</u>, ECF No. 259. SWK and Acumatica responded in opposition to this motion on June 27, 2025, <u>SWK</u>, ECF Nos. 259; 271, and Oakwood replied on July 8, 2025, <u>SWK</u>, ECF No. 280.

Also on June 13, 2025, Acumatica moved for judgment as a matter of law on its crossclaims against SWK. <u>SWK</u>, ECF No. 266. SWK responded in opposition on June 27, 2025, <u>SWK</u>, ECF No. 269, and Acumatica replied on July 7, 2025, <u>SWK</u>, ECF No. 277.

On June 17, 2025, SWK filed a renewed motion for judgment as a matter of law and moved for a new trial, <u>SWK</u>, ECF No. 262, and Acumatica similarly renewed its motion for judgment as a matter of law, <u>SWK</u>, ECF No. 263. Oakwood responded in opposition to each of these motions on July 1, 2025. <u>SWK</u>, ECF No. 276; <u>Acumatica</u>, ECF No. 198. Both SWK and Acumatica filed their respective replies on July 8, 2025. <u>SWK</u>, ECF No. 281; <u>Acumatica</u>, ECF No. 282.

The court held a hearing on many of the issues presented in the post-trial motions on July 18, 2025. <u>SWK</u>, ECF No. 288. Specifically, the court heard from the parties at this hearing on six topics: (1) SWK's renewed motion for judgment as a matter of law on

6

Oakwood's breach of warranty claim; (2) Oakwood's motion to invalidate limited liability provisions (3) Oakwood's motion for treble damages; (4) Oakwood's motion for prejudgment interest (5) Oakwood's motion for attorney's fees and bill of costs; and (6) Acumatica's motion for judgment as a matter of law on its crossclaims against SWK. Id. The court informed the parties that it would rule from the briefs on all other issues presented in their post-trial motions. As such, all post-trial motions are now fully briefed and ripe for the court's review.

## II.  DISCUSSION

The court divides the post-trial filings into seven pending motions and will consider them in the following order: The court will first examine the two motions attacking the jury's verdict: (1) SWK's Renewed Motion for Judgment as a Matter of Law and/or New Trial, SWK, ECF No. 262; and (2) Acumatica's renewed motion for judgment as a matter of law, SWK, ECF No. 263. After deciding whether to affirm the jury's verdict, the court will examine the four motions related to damages: (3) Oakwood's motion to invalidate liability limitations as to statutory remedies, SWK, ECF No. 259; (4) Oakwood's motion for treble damages, SWK, ECF No. 258; (5) Oakwood's motion for prejudgment interest, SWK, ECF No. 257; and (6) Oakwood's motion for attorney's fees, SWK, ECF No. 248, and bill of costs, SWK, ECF No. 249. After determining the extent of the defendants' liability to Oakwood, the court will conclude by examining the sole motion related to Acumatica's crossclaim against SWK: (7) Acumatica's motion for judgment as a matter of law on its crossclaims against SWK, SWK, ECF No. 266.

### A. Motions Attacking the Jury's Verdict

Both defendants moved for judgment as a matter of law at the end of Oakwood's case during trial, and the court denied each of those motions at that time. SWK now renews its motion for judgment as a matter of law, moves for a new trial <u>nisi</u> remittitur, and/or moves for a new trial pursuant to Federal Rules of Civil Procedure 50(b) and 59(a), <u>SWK</u>, ECF No. 262, and Acumatica similarly renews its motion for judgment as a matter of law pursuant to Rule 50(b), <u>SWK</u>, ECF No. 263.

Federal Rule of Civil Procedure 50(b) provides that "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a) [before the case is submitted to the jury], the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). A district court should award judgment as a matter of law to a movant pursuant to Rule 50(b) "if a reasonable jury could only reach one conclusion based on the evidence or if the verdict in favor of the non-moving party would necessarily be based upon speculation and conjecture." <u>Myrick v. Prime Ins. Syndicate, Inc.</u>, 395 F.3d 485, 489 (4th Cir. 2005); <u>see also</u> <u>Persinger v. Norfolk & W. Ry. Co.</u>, 920 F.2d 1185, 1189 (4th Cir. 1990) (finding that the court should grant judgment as a matter of law only if "the evidence is so clear that reasonable men could reach no other conclusion than the one suggested by the moving party"). A movant is entitled to judgment as a matter of law "if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof." <u>Price v. City of Charlotte</u>, 93 F.3d 1241, 1249 (4th Cir. 1996); <u>see</u> <u>Wheatley v. Wicomico Cnty.</u>, 390 F.3d 328, 332 (4th Cir. 2004) (determining a motion for judgment as a matter of law should be granted following

a jury's verdict "if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof").

Judgment as a matter of law is appropriate when the evidence can support only one reasonable conclusion. See Chaudhry v. Gallerizzo, 174 F.3d 394, 405 (4th Cir. 1999). "[T]he evidence and all reasonable inferences from it are assessed in the light most favorable to the non-moving party, and the credibility of all evidence favoring the non-moving party is assumed." Crinkley v. Holiday Inns, Inc., 844 F.2d 156, 160 (4th Cir. 1988); see also Konkel v. Bob Evans Farms, Inc., 165 F.3d 275, 279 (4th Cir. 1999) (finding that a Rule 50 motion should be granted "if a district court determines, without weighing the evidence or considering the credibility of the witnesses, that substantial evidence does not support the jury's findings"). If there is any evidence on which a reasonable jury could return a verdict in favor of the nonmoving party, judgment as a matter of law should not be granted. Price, 93 F.3d at 1249. "If reasonable minds could differ, [the court] must affirm the jury's verdict." Pitrolo v. Cnty. of Buncombe, 407 F. App'x 657, 659 (4th Cir. 2011) (citing Dennis v. Columbia Colleton Med. Ctr., 290 F.3d 639, 645 (4th Cir. 2002)).

Alternatively, a motion for a new trial under Federal Rule of Civil Procedure 59(a) may be granted "on all or some of the issues . . . to any party . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a).

> Despite the permissive language of this Rule, [the Fourth Circuit has] interpreted it to require district courts to "set aside the verdict and grant a new trial" where "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict."

9

Doe v. Fairfax Cnty. Sch. Bd., 1 F.4th 257, 268 (4th Cir. 2021) (quoting Minter v. Wells Fargo Bank, N.A., 762 F.3d 339, 346 (4th Cir. 2014)). "The decision to grant or deny a new trial is within the sound discretion of the district court . . . ." Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998).

### 1. SWK's Renewed Motion for Judgment as a Matter of Law, New Trial <u>Nisi</u> Remittitur, and/or New Trial

SWK renews its motion for judgment as a matter of law on Oakwood's claims for a SCUTPA violation, breach of warranty, and breach of contract. SWK, ECF No. 262. The court will consider its arguments on each of these claims in turn before turning to its alternative argument on why the court should grant a new trial.

### a. Oakwood's SCUTPA Claim Against SWK

SWK first argues that Oakwood failed to present evidence at trial to support its SCUTPA claim. Id. at 14–26. A plaintiff seeking to maintain an unfair trade practices claim under the SCUTPA must establish:

> (1) the defendant engaged in an unlawful trade practice; (2) the plaintiff suffered actual, ascertainable damages as a result of the defendant's use of the unlawful trade practice; and (3) the unlawful trade practice engaged in by the defendant had an adverse impact on the public interest.

Bessinger v. Food Lion, Inc., 305 F. Supp. 2d 574, 579 (D.S.C. 2003), aff'd, 115 F. App'x 636 (4th Cir. 2004). SWK contends that Oakwood failed to present evidence on the first and third elements. SWK, ECF No. 262 at 14–26. The court will take each of these elements in turn.

### i. Unfair or Deceptive Trade Practices

The SCUTPA defines unlawful trade practices as "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade." S.C. Code Ann. § 39–5–20(a). "An unfair trade practice has been defined as a practice which

is offensive to public policy or which is immoral, unethical, or oppressive." deBondt v.

Carolton Motorcars, Inc., 536 S.E.2d 399, 407 (S.C. Ct. App. 2000). Notably, "a plaintiff

need not prove the elements of common law deceit in order to establish a violation of the

[SCUTPA] since, under the statute, there is no need to show that a claim or

representation was intended to deceive but only that it had the capacity, effect, or

tendency to deceive." Young v. Century Lincoln-Mercury, Inc., 396 S.E.2d 105, 108

(S.C. Ct. App. 1989), aff'd in part, rev'd in part on other grounds, 422 S.E.2d 103 (S.C.

1992). In other words, "[t]he plaintiff need not show intentional deception, but a plaintiff

cannot prevail without showing at least a potential of deception." Clarkson v. Orkin

Exterminating Co., 761 F.2d 189, 191 (4th Cir. 1985) (applying South Carolina law).

"Even a truthful statement may be deceptive if it has a capacity or tendency to deceive."

Young, 396 S.E.2d at 108. Still, "[a] statutory prohibition of deceptive practices simply

does not reach expected puffing of a vendor's product nor authorize an award of damages

solely on the basis of testimony from a competitor that the product is ineffective."

Clarkson, 761 F.2d at 191.

SWK begins by arguing that its representations to Oakwood are not actionable

under the SCUTPA because they were promises of future performances or were mere

puffing. SWK, ECF No. 262 at 15–17. SWK then argues that there was no evidence that

it misrepresented Acumatica ERP's capability to do multiple-pick shipping, which was

critical to Oakwood's business. Id. at 17–19. After that, SWK contends that Oakwood

failed to present evidence showing that its dissatisfaction was caused by any unfair or

deceptive practices. Id. at 20–21. Rather, SWK argues that the failed implementation of

11

Acumatica ERP was caused by Oakwood's internal dysfunction and Oakwood abandoning the project. Id. at 20–22.

In response, Oakwood argues that the court already ruled that SWK's representations were actionable unfair or deceptive practices and that the SCUTPA does not require proof of common law fraud. SWK, ECF No. 276 at 11–12. Moreover, Oakwood points to testimony indicating that SWK's salesmen knew Oakwood required multi-pick shipping as part of its business, that Oakwood had that capability under Sage, and that SWK specifically assured Oakwood that Acumatica ERP would be a good product for Oakwood. Id. at 13–14. Oakwood also points to testimony from Jeremy Potoka ("Potoka"), one of SWK's salesmen, indicating that Acumatica ERP was never designed to facilitate multi-pick shipping. Id. at 13–14 (citing Tr. 502:6–7).

In reply, SWK reiterates that Oakwood's witnesses testified at trial that they gave SWK conflicting directions throughout the project. SWK, ECF No. 281 ¶ 4. SWK also accuses Oakwood of misrepresenting Potoka's trial testimony. Id. ¶ 5. SWK characterizes Potoka's testimony as stating that Acumatica ERP was not designed to accommodate Oakwood's business practices when those practices were "unique and different." Id. Further, SWK reiterates that it is not trying to equate the SCUTPA and common law fraud but that there is substantial overlap between what is required to prove each of these claim. Id. ¶ 6. Finally, SWK accuses Oakwood of arguing that it does not need to show damages caused by actual deception. Id. ¶ 7.

The court agrees with Oakwood. Many of the arguments SWK now makes are similar to those it made in its most recent motion for summary judgment. In reviewing that motion, the court found that "[t]here [was] sufficient evidence for a jury to find that

SWK engaged in deceptive conduct when it made representations about the suitability of Acumatica ERP for Oakwood's business and about SWK's ability to implement Acumatica ERP to meet Oakwood's business needs." SWK, ECF No. 198 at 10. In support of that conclusion, the court reviewed evidence about conversations that took place between SWK's salesmen and Oakwood's employees regarding Oakwood's experience with Sage 500, Oakwood's processes and needs, and about Acumatica ERP's suitability to meet those needs. Id. at 10–14.

The evidence presented at trial was substantially similar to the evidence before the court when the court issued that order. For instance, the court heard testimony during trial from Dr. Eldon Baird ("Dr. Baird"), Oakwood's operations manager, about Oakwood's need for multi-pick shipment and credit card reauthorization features. Tr. 355:4–356:2. The court also heard testimony from Dr. Jeanne Stewart ("Dr. Stewart"), a chemist at Oakwood, and Greg Butler ("Butler"), Oakwood's president, indicating the SWK salesmen, namely Potoka and Dene Powell ("Powell"), engaged in a discovery process to learn Oakwood's business needs; that the salesmen were aware of Oakwood's specific needs and experience with Sage 500; that the salesmen made specific assurances about the capacities of Acumatica ERP; that Oakwood relied on those assurances in deciding to purchase Acumatica ERP; and that those assurances turned out to have been untrue. See Tr. 73:7–12, 97:6–99:14, 117:21–119:16, 301:19–302:12, 441:21–24. The jury also heard testimony from Potoka which, contrary to SWK's assertion, could reasonably be interpreted as suggesting that Acumatica ERP was never designed to accommodate some of the features Oakwood sought. See Tr. 595:9–21. Thus, based on the record at trial and the court's reasoning in its order denying summary judgment, the

13

court finds that there was sufficient evidence to support the jury's finding that SWK engaged in an unlawful trade practice which caused Oakwood's damages.

### ii.     Public Interest

SWK next argues that Oakwood failed to present evidence from which the jury could have found that SWK's conduct had an adverse impact on the public interest. SWK, ECF No. 262 at 22–26.  A plaintiff may show that unfair or deceptive acts or practices have an impact upon the public interest by demonstrating a potential for repetition.  Haley Nursery Co. v. Forrest, 381 S.E.2d 906, 908 (S.C. 1989); Noack Enters., Inc. v. Country Corner Interiors of Hilton Head Island, Inc., 351 S.E.2d 347, 350–51 (S.C. Ct. App. 1986).  The potential for repetition is generally demonstrated in one of two ways: "(1) by showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence; or (2) by showing the company's procedures create a potential for repetition of the unfair and deceptive acts." Wright v. Craft, 640 S.E.2d 486, 502 (S.C. Ct. App. 2006).  SCUTPA relief is "not available to redress a private wrong where the public interest is unaffected."  Columbia E. Assoc. v. Bi–Lo, Inc., 386 S.E.2d 259, 263 (S.C. Ct. App. 1989).  Even "a deliberate or intentional breach of a valid contract, without more, does not constitute a violation of the [SCUTPA]."  Id.

At trial, Oakwood presented evidence to the jury about the relationship between SWK and some of its former customers, namely the Champion Thread Company ("Champion Thread") and Arch-I-Tech Doors ("Arch-I-Tech").  See, e.g., Tr. 349:14–15, 415:13–14; SWK, ECF Nos. 285, Arch-I-Tech 30(b)(6) Depo.; 286, Champion Thread

30(b)(6) Depo.[5]  SWK argues in its current motion that that evidence was insufficient to satisfy the public interest element because "the other customers are dissimilar and irrelevant because the nature, source, and reasons for their dissatisfaction are all fundamentally different from one another."  SWK, ECF No. 262 at 23–24.  SWK contends that the experience of each modification was unique and accuses Oakwood of "cherry-pick[ing]" a few dissatisfied customers, despite hundreds of successful implementations.  Id. at 24.  Beyond that, SWK asserts that none of the other customers required the same unique software modifications as Oakwood, such as a multiple-pick shipment option.  Id.

According to the portions of Arch-I-Tech's 30(b)(6) deposition that were read into the record at trial, Arch-I-Tech worked with Potoka and Powell and told these two SWK salesmen about Arch-I-Tech's needs, specifically including Arch-I-Tech's concerns with character limitations.  Arch-I-Tech 30(b)(6) Depo. at 25:3–13, 32:22–33:1, 63:12–64:11.  Despite Potoka and Powell demonstrating specific features to Arch-I-Tech and making claims about what Acumatica ERP could do "out-of-the-box," Arch-I-Tech eventually felt disillusioned after realizing that Acumatica ERP did not have the functionality Potoka and Powell claimed.  Id. at 72:16–74:6.  Oakwood also entered an

_____

[5] Portions of both the Arch-I-Tech 30(b)(6) and Champion Thread 30(b)(6) depositions were read into the record at trial.  Tr. 349:14–15, 415:13–14.  Before trial, the parties designated which portions of the depositions they wanted read into the record, and the court made rulings on which of those designations were admissible.  After the trial, the parties filed copies of both depositions for the record as SWK, ECF No. 285, Arch-I-Tech 30(b)(6) Depo. and SWK, ECF No. 286, Champion Thread 30(b)(6) Depo.  The parties redacted these transcripts, so that they do not include the portions that neither party designated to be read at trial.  They struck through the portions that they designated but that the court deemed inadmissible.  Thus, the portions of the deposition transcripts that are visible and not struck through are what was read to the jury at trial.

email into evidence, in which Arch-I-Tech's design and development consultant complained to SWK's development manager, "Our team is experiencing some pretty significant disillusionment in the wake of our recent character limitation discovery. That was not at all the product we were sold, nor was that what was demonstrated during the sales process (which leveraged our own data)." Pl.'s Ex. 36 at 1.

Similarly, portions of Champion Thread's 30(b)(6) deposition were read into the record at trial. This testimony indicated that Powell convinced Champion Thread to purchase Acumatica ERP. Champion Thread 30(b)(6) Depo. at 25:21–28:11. Like both Oakwood and Arch-I-Tech, Powell and Potoka visited Champion Thread and discussed Champion Thread's business process and needs, specifically including its need to scan yarn into inventory. Id. at 38:14–40:5. However, Champion Thread later discovered that the Acumatica ERP was not able to accommodate this feature in the way SWK had represented. Id. at 66:9–69:12.

It is true that the other SWK customers discussed at trial did not require the same customizations as Oakwood. However, as the court discussed in its order on summary judgment, the evidence of these other customer's experiences is sufficiently similar to that of Oakwood to satisfy the public interest element. In short, viewing all facts in Oakwood's favor, there was evidence presented at trial from which a reasonable jury could find that SWK made representations to all of these customers about the suitability of Acumatica ERP to their business needs and the level of customization required and that those representations later turned out to be untrue. Thus, the relevant aspects of Oakwood's experience are capable of repetition, and there was therefore evidence

16

presented at trial to support the public interest element of Oakwood's SCUTPA claim. Accordingly, denies SWK's motion with respect to that claim.

### b.     Oakwood's Breach of Warranty Claim against SWK

SWK next argues that it is entitled to judgment as a matter of law on Oakwood's claim for breach of express warranty for three reasons.  <u>SWK</u>, ECF No. 262 at 27–30. First, SWK argues that Oakwood abandoned the implementation project before any product was ever completed or delivered, so no product warranty was ever put into effect. <u>Id.</u> at 28.  Second, SWK argues that there can be no breach of express warranty for services.  <u>Id.</u> .  Finally, SWK contends that it is entitled to judgment as a matter of law on this claim because the evidence in the record shows that it was still performing under its contract with Oakwood when Oakwood abandoned the contract.  <u>Id.</u> at 29–30.

In response, Oakwood argues that there is ample evidence in the record to prove that SWK breached the express warranty in the MSA and other express warranties made by the SWK salesmen regarding the capabilities of Acumatica ERP.  <u>SWK</u>, ECF No. 276 at 20–21.  First, Oakwood contends that it is factually inaccurate for SWK to claim Oakwood abandoned the project before a product was delivered.  <u>Id.</u> at 21.  While SWK did not implement Acumatica ERP in a suitable manner to meet Oakwood's needs, Oakwood argues that it did sign the Order Form, a contract through which it received a license for Acumatica ERP in exchange for payment.  <u>Id.</u> (citing Tr. 157:15–158:19; Pl.'s Ex. 112).  In making this argument, Oakwood notes that this was the reason the court previously granted summary judgment on Oakwood's claim against Acumatica for recission: "[e]ven if SWK later failed at customizing Acumatica ERP to meet Oakwood's needs, there is no evidence to suggest that Oakwood did not receive the very license it

contracted for in the Order Form." Id. at 22 (quoting SWK, ECF No. 198 at 43). Second, Oakwood challenges SWK's claim that SWK is merely a service provider. Id. Instead, Oakwood argues that SWK is a reseller of Acumatica ERP and that SWK made specific, express warranties about the capabilities of Acumatica ERP which later turned out not to have been true. Id.

In reply, SWK contends that Oakwood's response argument—that it contracted for and received a license for Acumatica ERP—contradicts the position Oakwood has held since the inception of this lawsuit—that it never received a product from SWK. SWK, ECF No. 281 ¶ 8. Moreover, if Oakwood's position is now that it received a license for Acumatica ERP from Acumatica, then SWK argues that Oakwood's dispute is with Acumatica, not SWK. Id.

Despite SWK's argument that South Carolina law does not recognize a breach of warranty cause of action for services, SWK does not cite to a single South Carolina case to support this proposition. See SWK, ECF No. 262 at 28. Moreover, there are South Carolina cases suggesting that a plaintiff can pursue a breach of express warranty claim based on a defendant's services when the services are tied to a product.[6] For example, in Burns v. Wannamaker, the South Carolina Court of Appeals found that a dentist could be liable for his "express pre-treatment warranty to effect a particular result . . . as to the manufacture and fit of dentures purchased from him by the [plaintiff]." 315 S.E.2d 179, 180 (S.C. Ct. App. 1984), aff'd as modified, 343 S.E. 2d 27 (S.C. 1986). This indicates

---

[6] The court makes no finding on whether South Carolina law would permit a breach of warranty claim when services are not tied to a product.

18

that a defendant who sells and implements a product can be held liable for his express warranties about both the quality of the product and his ability to implement that product.

Additionally, Oakwood is correct that the court granted summary judgment on its recission claim against Acumatica specifically because Oakwood received a license for Acumatica ERP via its Order From, meaning there was no failure of consideration. SWK, ECF No. 198 at 43.  Evidence presented at trial further shows that SWK has a reseller agreement with Acumatica to sell its software, Tr. 679:18–20, and Butler also testified at trial that Oakwood signed the Order Form after Powell made specific assurances about Acumatica ERP's capabilities, and it was Powell who supplied the Order Form to Oakwood.  Tr. 440:2–443:19.  Viewing this evidence in the light most favorable to Oakwood, the court denies SWK's renewed motion for judgment as a matter of law on Oakwood's breach of express warranty claim.

### c.        Oakwood's Breach of Contract Claim

SWK argues that the evidence indicates Oakwood abandoned the MSA and SOW and thereby surrendered its right to assert that SWK breached those agreements.  SWK, ECF No. 262 at 30–32.  To establish breach of contract under South Carolina law, a plaintiff must establish three elements: (1) a binding contract entered into by the parties; (2) breach or unjustifiable failure to perform the contract; and (3) damages as a direct and proximate result of the breach.  See King v. Carolina First Bank, 26 F. Supp. 3d 510, 517 (D.S.C. 2014).  When one party abandons a contract, it gives up the right to a benefit due from the other party.  U.S. ex rel. Williams Elec. Co. v. Metric Constructors, Inc., 480 S.E.2d 447, 450 (S.C. 1997).  "A contract will be treated as abandoned when the acts of one party inconsistent with its existence are acquiesced in by the other party."  Ro-Lo

Enters. v. Hick Enters., Inc., 362 S.E.2d 888, 889 (S.C. Ct. App. 1987).  "The abandonment of a contract is a matter of intention to be ascertained from the facts and circumstances surrounding the transaction from which the abandonment is claimed to have resulted."  Quality Concrete Prods., Inc. v. Thomason, 172 S.E.2d 297, 302 (S.C. 1970).

SWK begins its argument by reviewing the provisions in the SOW and MSA. SWK, ECF No. 262 at 31.  It notes that the SOW provides which specific modules and services SWK was going to perform and that the MSA provides that Oakwood would participate and cooperate with SWK in the implementation project.  Id.  SWK then points to testimony from Oakwood's witnesses indicating that, despite Oakwood's agreements with SWK, Oakwood entered a contract with TechRiver and started work on a different implementation.  Id. at 31–32.  Yet SWK emphasizes that Oakwood did not inform SWK that it was terminating its agreements with SWK and, instead, that Butler informed SWK that the implementation project was simply "on hold."  Id.  SWK emphasizes that, by this point, it had only worked approximately one-third of the hours it had estimated would be necessary at the beginning of the project and that TechRiver provided Oakwood a "Blueprint" indicating SWK's implementation could be completed if Oakwood had given SWK the chance to do so.  Id.  All in all, SWK characterizes the evidence as showing that Oakwood "secretly" abandoned its agreements with SWK and led SWK to believe the project was still moving forward until service of this lawsuit, so as to voluntarily give up its right to contractual benefits.  Id.; SWK, ECF No. 281 ¶ 9.

To SWK's point, the evidence could be interpreted to show that Oakwood abandoned its agreements with SWK.  See, e.g., Tr. 236:25–238:8.  However, there is

also evidence pointing in the other direction. For example, the SOW specifically provides that, during the analysis phase, "the SWK implementation team will focus on gathering key business requirements, forms and reporting requirements to help set the stage of configuring Acumatica [ERP] to meet those requirements." Pl.'s Tr. Ex. 4 at 7. A reasonable jury could find from the evidence that the implementation problems faced by Oakwood were initially caused by SWK failing to adequately learn Oakwood's business needs. See, e.g., Tr. 593:19–594:597:6. Thereafter, in January 2020, Oakwood began to learn that Acumatica ERP could not perform multi-pick shipments in the manner Oakwood needed, despite SWK having already reviewed Oakwood's business needs. See Pl.'s Tr. Ex. 21; Tr. 119:3–121:14, 134:14–137:6. SWK explained to Oakwood at that point that additional time and money would be required to make those needed modifications. See Tr. 134:14–137:6. A few months later, Oakwood hired TechRiver to consult on its options moving forward. Tr. 142:8–23 ("[W]hat we were trying to get at is to take a third-party that has no interest in either side and give a straight analysis of the best path to follow forward."). TechRiver explored both continuing with Sage and the feasibility of continuing with Acumatica ERP. Tr. 142:24–144:9; Pl.'s Tr. Exs. 29; 30. Ultimately, Oakwood decided against continuing to pursue the Acumatica ERP implementation with SWK because Oakwood felt that SWK could not deliver on the implementation in the manner SWK had originally promised. See Tr. 156:14–18; 237:9–24.

Even if Oakwood took actions inconsistent with its agreements with SWK, a reasonable jury could find that it did so only after it became apparent that SWK had failed to comply with its own obligations to learn Oakwood's needs and deliver a product

that met those needs within the anticipated costs and timeline. From this, a reasonable jury could infer that Oakwood did not intend to give up its contractual right to a product that met its needs without incurring additional costs or delays. Thus, a reasonable jury could find from the evidence that Oakwood did not abandon its agreements with SWK, and the court denies this portion of SWK's motion.

### d.  Remittitur

Finally, SWK argues that it is entitled to remittitur or a new trial because the jury's award exceeded the maximum amount recoverable under the MSA's liability limitation provision. SWK, ECF No. 262 at 32–34. "Remittitur, which is used in connection with Fed. R. Civ. P. 59(a), 'is a process, dating back to 1822, by which the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award.'" Cline, 144 F.3d at 305 (quoting Atlas Food Sys & Servs., Inc. v. Crane Nat. Vendors, Inc., 99 F.3d 587, 593 (4th Cir. 1996)). In essence, SWK contends that, through this provision, Oakwood agreed to limit its damages and that, because the jury's award exceeds the maximum recovery under that provision, the damages must be reduced or the court should order a new trial. SWK, ECF No. 262 at 32–34. For reasons explained below, the court finds that the MSA liability limitation provision is unenforceable as to Oakwood's recovery for damages under the SCUTPA and denies this portion of SWK's motion for this reason.[7]

---

[7] Additionally, the court finds that there are no other reasons why a new trial is needed in this case. Thus, to the extent, if at all, that SWK argues the court should grant a new trial based on, for instance, the weight of the evidence, the court finds that there is no reason for a new trial in this case and denies this portion of SWK's motion.

Thus, the court denies SWK's renewed motion for judgment as a matter of law, new trial <u>nisi</u> remittitur, and/or new trial in its entirety.

## 2. Acumatica's Renewed Motion for Judgment as a Matter of Law

The jury found Acumatica vicariously liable for SWK's SCUTPA violation based on the principal-agent relationship between the two companies.  <u>SWK</u>, ECF No. 247 at 5–6.  Acumatica argues that this finding was in error and that the court should grant judgment as a matter of law on this claim for three reasons.  <u>SWK</u>, ECF No. 263-1.  First, Acumatica asserts that there was insufficient evidence at trial to support a finding that SWK violated the SCUTPA.  <u>Id.</u> at 2–3.  Second, Acumatica argues that the evidence was insufficient for the jury to find that a principal-agent relationship existed between Acumatica and SWK and that Acumatica therefore cannot be vicariously liable for SWK's SCUTPA violation.  <u>Id.</u> at 3–13.  Third, Acumatica maintains that a principal cannot be vicariously liable for an agent's SCUTPA violation as a matter of South Carolina law.  <u>Id.</u> at 13–16.

The court disagrees with the three arguments asserted by Acumatica for the same reasons the court expressed when faced with these arguments on other occasions.  First, the court finds that there was sufficient evidence for the jury to find SWK liable for violating the SCUTPA for the reasons discussed when the court considered SWK's renewed motion for judgment as a matter of law.

Second, in its order on summary judgment, the court found that there was a genuine issue of material fact over the existence of an agency relationship between Acumatica and SWK, based largely on testimony from Acumatica's 30(b)(6) designee. <u>SWK</u>, ECF No. 198 at 37–38.  Those same portions of the deposition testimony were

read into the record at trial.  See ECF No. 284, Acumatica 30(b)(6) Depo. at 106:24–107:14, 213:13–215:8.  In essence, those excerpts indicate that Acumatica held SWK out as its "partner," exerted control over SWK, and that Acumatica relied on SWK to present the Acumatica Order Form to customers to license Acumatica ERP as part of that relationship.  Id.  Just as it did in its summary judgment order, making all reasonable inferences in Oakwood's favor, the court finds that a reasonable jury could interpret this evidence as showing that Acumatica was the principle in an agency relationship with SWK.  See SWK, ECF No. 198 at 37–38.  Beyond that, part of the basis of Oakwood's SCUTPA claim against SWK was that Acumatica ERP should never have been licensed to Oakwood because that product was not suited to meet Oakwood's needs, see 2d Amend. Compl. ¶ 93, and the jury heard testimony at to support that claim, see Tr. 595:9–16 (Potoka's testimony that Acumatica ERP was designed not to accomplish multi-pick shipping in the manner needed by Oakwood).  Thus, viewing this evidence in the light most favorable to Oakwood, there is evidence to support the jury's finding that SWK's SCUTPA violation was within the scope of Acumatica and SWK's agency relationship.  See Tr. 595:9–16; see also SWK, ECF No. 263-1 at 7 ("Acumatica concedes that it granted SWK the authority to present the Acumatica Order From to potential customers, but that is where the scope of actual authority ended.").

Third, the court found in its summary judgment order that an entity can be vicariously liable for an agent's SCUTPA violation based on the decision in Nautilus Insurance Co. v. Murdaugh, 2024 WL 3042815, at *8 (D.S.C. June 18, 2024).  SWK, ECF No. 198 at 37.  Acumatica correctly asserts that Nautilus involved different facts and is not binding precedent on this court.  SWK, ECF No. 263-1 at 13–16.  However,

Acumatica does not present any real argument on how those factual dissimilarities should result in a different conclusion in this case, and the court relies on the reasoning in that case in reaffirming the decision it expressed in the summary judgment order that a entity can be vicariously liable for an agent's SCUTPA violation. See SWK, ECF No. 198 at 37.

Thus, the court denies Acumatica's renewed motion for judgment as a matter of law in its entirety.

### B. Motions Related to Damages

### 3. Oakwood's Motion to Invalidate Limited Liability Provisions

The MSA between Oakwood and SWK includes the following Limitations on Liability Provision:

> 7.     **Limitations on Liability** - IN NO EVENT SHALL SWK BE LIABLE TO CUSTOMER OR ANY OTHER PERSON OR ENTITY FOR ANY LOSS OF RECORDS OR DATA OR FOR SPECIAL, EXEMPLARY, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY KIND OR NATURE WHATSOEVER, WHETHER OR NOT THE POSSIBILITY OF SUCH DAMAGES HAS BEEN DISCLOSED TO SWK IN ADVANCE OR COULD HAVE BEEN REASONABLY FORESEEN BY SWK, AND WHETHER IN AN ACTION BASED ON CONTRACT, WARRANTY, STRICT LIABILITY, TORT OR OTHERWISE. SWK'S TOTAL LIABILITY FOR DAMAGES ARISING OUT OF THIS AGREEMENT OR ANY STATEMENT OF WORK FOR ANY SERVICES PERFORMED OR PRODUCTS OR DELIVERABLES PROVIDED HEREUNDER OR THEREUNDER, WHETHER IN AN ACTION BASED ON CONTRACT, WARRANTY, STRICT LIABILITY, TORT OR OTHERWISE, SHALL NOT EXCEED THE TOTAL AMOUNT PAID OR PAYABLE BY CUSTOMER TO SWK HEREUNDER.

Pl.'s Ex. 3 ¶ 7.

The court examined the enforceability of this provision in two previous orders. First, the court ruled, in a November 10, 2021 order on partial summary judgment (the "2021 Order") that the MSA's liability limitation provision was enforceable and not

unconscionable.  SWK, ECF No. 40 at 7–17.  The court explained that the MSA "is a fairly succinct six-page contract with five pages of terms."  Id. at 16.  It also noted that the liability limitation provision is set out in clear terms, is clearly conspicuous, and that Oakwood is a sophisticated entity, meaning there was not a disparity in bargaining power.  Id.  Notably, however, the court issued the 2021 Order before Oakwood amended its complaint to add its SCUTPA claim for the first time in July 2022.  See SWK, 2d Amend. Compl.

The court also examined the MSA's liability limitation provision in its March 26, 2025 order on partial summary judgment (the "2025 Order").  SWK, ECF No. 198 at 18–22.  In the 2025 Order, the court found that the terms of the provision unambiguously applied to Oakwood's SCUTPA claim—including damages available under that statute.  Id. at 20–22.  However, the court expressly declined to determine whether enforcing the provision to limit statutory damages under the SCUTPA would be unconscionable or violate public policy, instead reserving that question for post-trial motions.  Id.

In that same 2025 Order, the court also determined that the Order Form between Oakwood and Acumatica unambiguously incorporated the terms of Acumatica's End User Licensing Agreement ("EULA").  Id. at 47.  Like SWK's MSA, Acumatica's EULA includes the following liability limitation provisions:

> **8.1 Limitation on Damages.** Except for a breach of Section 3, in no event shall either party be liable to the other or any other party for any indirect, incidental, consequential, special, exemplary, or punitive damages or lost profits, even if advised of the possibility of such damages.
>
> **8.2 Limitation on Liability.** Except for Acumatica's indemnification obligations pursuant to Section 6, Acumatica's cumulative liability to you, your Affiliates, or any other party for any loss or damages resulting from any claims, demands, or actions arising out of or relating to this Agreement shall be limited (i) in the case of a Perpetual License, to the Fees received by Acumatica for the Software prorated over a five (5) year term

> commencing with the date your Perpetual License commenced pursuant to Section 5.1, or (ii) in the case of a Subscription License to the Fees received by Acumatica for the last twelve (12) months. This limitation applies to all causes of action or claims in the aggregate, including, without limitation, breach of contract, breach of warranty, indemnity, negligence, strict liability, misrepresentation, and other torts.

Acumatica's Ex. 2 at 16 (emphasis omitted).

Oakwood argues in its motion that the court should invalidate both the MSA's and the EULA's liability limitation provisions because limiting the statutory damages available to Oakwood under the SCUTPA would contravene South Carolina public policy. SWK, ECF No. 259 at 6–12. Oakwood relies, in large part, on the South Carolina Supreme Court's decision in Simpson v. MSA Myrtle Beach, Inc., 644 S.E.2d 663, 668 (S.C. 2007). SWK, ECF Nos. 259 at 6–10; 280 at 1–9.

In Simpson, the court examined an arbitration provision that specially prohibited the arbitrator from awarding "punitive, exemplary, double, or treble damages (or any other damages which are punitive in nature or effect) against either party." 644 S.E.2d at 666. The issue was whether this provision was enforceable to limit damages otherwise available to the plaintiff under the SCUTPA and the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. Code Ann. § 56-15-10, et seq. Simpson, 644 S.E.2d at 670–71. The court explained that there were two reasons why the arbitration clause was not enforceable:

> The general rule is that courts will not enforce a contract which is violative of public policy, statutory law, or provisions of the Constitution. In our opinion, this rule has two applications in the present case. First, this arbitration clause violates statutory law because it prevents [the plaintiff] from receiving the mandatory statutory remedies to which she may be entitled in her underlying SCUTPA and Dealers Act claims. Second, unconditionally permitting the weaker party to waive these statutory remedies pursuant to an adhesion contract runs contrary to the underlying statutes' very purposes of punishing acts that adversely affect the public

27

      interest.  Therefore, under the general rule, this provision in the arbitration
      clause is unenforceable.

<u>Id.</u> at 671 (citation and footnote omitted).

      SWK raises seven arguments in response.  First, SWK argues that the court already found in previous orders that the MSA's liability limitation provision was enforceable, not unconscionable, and applies to Oakwood's SCUTPA claim.  <u>SWK</u>, ECF No. 271 at 6–7.  Second, SWK argues that public policy, as expressed in various South Carolina court decisions, generally requires freedom of contract and upholding the intent of the parties.  <u>Id.</u> at 7–8.  Third, SWK observes that the SCUTPA does not specifically prohibit contractual limitations on liability precluding statutory damages.  <u>Id.</u> at 8–11.  In contrast, SWK notes that the Dealers Act includes several overlapping provisions and is similar in application with the SCUTPA but does specifically include a provision outlawing any contractual provision limiting recovery of damages available under that statute.  <u>Id.</u> (citing S.C. Code Ann. § 56-15-130).  Fourth, SWK argues that, when courts invalidate agreements on public policy grounds, they do so almost exclusively in cases in which the parties entered the agreement under unequal bargaining power, which is not true in this case.[8]  <u>SWK</u>, ECF No. 271 at 11–12.  Fifth, SWK attempts to distinguish the cases cited by Oakwood because Oakwood primarily relies on cases dealing with arbitration clauses which implicated interwoven legal and factual issues not present in this case.  <u>Id.</u> at 13–15.  Sixth, SWK notes that the jury declined to award the full amount of damages requested by Oakwood and that it found for SWK on Oakwood's fraudulent

---

      [8] For example, SWK notes that in <u>Simpson</u>, the South Carolina Supreme Court discussed the parties' unequal bargaining when determining the arbitration provision was unenforceable as a one-sided transaction.  <u>SWK</u>, ECF No. 271 at 11 (citing <u>Simpson</u>, 644 S.E.2d at 671).

nondisclosure claim. Id. at 15–16. SWK contends that this supports its position "that there is no basis to award extra-contractual recovery of any amount to Oakwood." Id. at 16. Seventh, SWK emphasizes that it would violate public policy to not enforce the parties' agreement as written because Oakwood engaged in underhanded conduct when it abandoned its contract with SWK and entered into secret agreements with other vendors. Id. at 17–18.

Acumatica responds with three arguments. SWK, ECF No. 275 at 2–8. First, Acumatica argues that the EULA's liability limitation provision limits the total damages, meaning it applies to statutory treble damages available under the SCUTPA. Id. at 2–4. Second, Acumatica argues that the language of the EULA is broader than language in a similar provision examined by the South Carolina Supreme Court in Maybank v. BB&T Corp., 787 S.E.2d 498, 518 (S.C. 2016).[9] SWK, ECF No. 275 at 5. Third and finally, Acumatica argues that public policy under both Washington and South Carolina law favors enforcing the EULA's liability limitation provision. Id. at 5–8. In making this argument, Acumatica first explains that the provision does not violate Washington public policy based on the factors identified by the Washington Court of Appeals in Riley v. Iron Gate Self Storage, 395 P.3d 1059, 1066 (Wash. Ct. App. 2017). SWK, ECF No. 275

---

[9] The court discussed Maybank when examining the language of the MSA's liability limitation provision in its March 2025 order on partial summary judgment. SWK, ECF No. 198 at 20–21. In that case, the supreme court found that the contract at issue did not limit treble damages under the SCUTPA based on the language of that agreement. Maybank, 787 S.E.2d at 517–18. This court agrees that the EULA's language is broader than the language at issue in Maybank. Compare Acumatica's Ex. 2 at 16; with Maybank, 787 S.E.2d at 514. However, this finding is only relevant to the determination of whether the EULA's language purports to cover statutory damages under the SCUTPA—not whether enforcement of the EULA is permissible as a matter of South Carolina public policy, which is the question currently before the court.

at 5–7.  After that, Acumatica argues that South Carolina public policy similarly favors enforcing the liability limitation provision because, as the court has previously found and as SWK also points out, Oakwood is a sophisticated party and the terms of the EULA were part of a bargained-for exchange.  Id. at 7–8.  Thus, Acumatica argues that its total damages must be limited to $69,513.00.  Id. at 8.

The court finds that the liability limitation provisions in the MSA and the EULA cannot be enforced as to the statutory remedies available to Oakwood under the SCUTPA.  First, despite SWK's argument otherwise, the court never ruled that the liability limitation provision barred statutory damages under the SCUTPA; rather, as explained above, the court expressly reserved the question of whether the liability limitations are enforceable with respect to Oakwood's SCUTPA claim on public policy grounds for post-trial motions.  SWK, ECF No. 198 at 21–22.  Second, while the decision in Simpson was related to an arbitration clause, the reasoning from the court indicates that a contractual provision that inhibits a plaintiff from recovering statutory remedies available under the SCUTPA is not enforceable.  See 644 S.E.2d at 671; accord Gladden v. Boykin, 739 S.E.2d 882, 883 (S.C. 2013) ("Our courts must determine public policy by reference to legislative enactments whenever possible.").  Relatedly, while the court in Simpson, 644 S.E.2d at 671, discussed the unequal bargaining power between the parties, that consideration is relevant to whether a provision is unconscionable, which is separate from the issue of whether such a provision is enforceable as a matter of public policy.[10]

---

[10] It is true that, in Simpson, the court appears to discuss the public policy implications of the arbitration provision as part of its analysis of whether the provision is unconscionable.  See 644 S.E.2d at 668–71.  Specifically, the court defines unconscionability as "the absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms that are so oppressive that no

Finally, there is no reason to think that the jury's finding on fraudulent nondisclosure—a claim with a higher standard of proof—should indicate a limitation on Oakwood's liability for a SCUTPA violation, and SWK cites to no legal authority to support its argument that Oakwood's alleged abandonment of its agreements with SWK have anything to do with the enforceability of the MSA's limited liability provisions. See SWK, ECF No. 271 at 17–18. For these reasons, the court finds that enforcing the MSA's liability limitation provision as to Oakwood's statutory remedies would contravene public policy and that the provision is therefore unenforceable as to the SCUTPA remedies.[11]

The court also finds that the EULA's liability limitation provision is unenforceable on South Carolina public policy grounds for the same reasons. Beyond

---

reasonable person would make them and no fair and honest person would accept them." Id. at 668. Ultimately, the court determined that the provision was unconscionable, and this discussion of the public policy implications comes from the court's analysis of whether the provision contains oppressive and one-sided terms. Id. at 671. However, in more recent cases, the court has treated its determination of whether a provision contravenes public policy separately from its determination of whether that provision is unconscionable. See, e.g., Maybank, 787 S.E.2d at 515 ("Moreover, should a court find the provision violates public policy or is unconscionable, the court may declare the provision unenforceable." (emphasis added); Gladden v. Boykin, 739 S.E.2d 882, 883–85 (S.C. 2013). As the court clarified in Gladden, the unconscionability analysis is based on the "circumstances surrounding [the contract's] formation" rather than exclusively the substance of the contract. 739 S.E.2d at 884.

[11] The court notes SWK's point that the Dealer's Act specifically includes a provision directly stating that "[a]ny provision or contract or part thereof or practice thereunder in violation of any provision of this chapter shall be deemed against public policy and shall be void and unenforceable," S.C. Code Ann. § 56-15-130, while the SCUTPA does not include a similar provision. Nevertheless, in Simpson, the supreme court specifically noted that provision from the Dealer's Act when it found that the arbitration clause at issue in that case contravened statutory remedies available to the plaintiff under both that statute and the SCUTPA. 644 S.E.2d at 671 n.7. From this, it appears that the supreme court did not find this distinction between the two statutes relevant.

that, it may be true, as Acumatica points out, that the EULA contains a choice-of-law provision electing Washington law. Acumatica's Ex. 2 at 17; see also SWK, ECF No. 198 at 30 n.15 (discussing the EULA's choice of law provision). However, "a choice-of-law clause in a contract will not be enforced if application of foreign law results in a violation of South Carolina public policy." Howell v. Covalent Chem., LLC, 867 S.E.2d 264, 267 (S.C. Ct. App. 2021). Consequently, because enforcement of the EULA's liability limitation provision would contravene South Carolina public policy, the court cannot enforce the choice-of-law clause, and it is therefore immaterial whether enforcement of the liability limitation provision would contravene Washington public policy.

For these reasons, the court grants Oakwood's motion to invalidate limited liability provisions as to its statutory remedies.

### 4. Oakwood's Motion for Treble Damages

Under the SCUTPA, "[i]f the court finds that the use or employment of the unfair or deceptive method, act or practice was a willful or knowing violation of Section 39-5-20,[12] the court shall award three times the actual damages sustained and may provide such other relief as it deems necessary or proper." S.C. Code Ann. § 39-5-140(a) (footnote added). Thus, because the jury determined that there was a SCUTPA violation in this case, the question for the court is now "whether the acts complained of constitute[] a willful or knowing violation of section 39-5-20, so as to mandate treble damages." See GTR Rental, LLC v. DalCanton, 547 F. Supp. 2d 510, 522–23 (D.S.C. 2008). "[A]

---

[12] Section 39-5-20 declares "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" as unlawful. S.C. Code Ann. § 39-5-20(a).

willful violation occurs when the party committing the violation knew or should have known that his conduct was a violation of Section 39-5-20." S.C. Code Ann. § 39-5-140(d). In other words, the standard of willfulness under the SCUTPA is not based in actual knowledge, but in constructive knowledge. State ex rel . Medlock v. Nest Egg Soc. Today, Inc., 348 S.E.2d 381, 384 (S.C. Ct. App. 1986). "If, in the exercise of due diligence, a person of ordinary prudence engaged in trade or commerce could have ascertained that his conduct violates the [SCUTPA], then such conduct is 'willful' within the meaning of the statute." Id.

Oakwood argues that "[t]he evidence in this case provides ample support for finding that SWK engaged in unlawful conduct that was willful and knowing for which treble damages are warranted." Id. at 9. In particular, Oakwood contends that SWK engaged in a "pattern of willfully misleading customers while knowing that the Acumatica ERP would not meet the customer's business requirements[, which] falls squarely within the public policy underlying the statutory remedies under the SCUTPA." Id. at 10. Oakwood further asserts that the evidence indicates SWK knew that Oakwood used Sage 500's multi-pick and credit card processing features because they saw as much during the discovery process. Id. at 10–11. SWK then, according to Oakwood, assured Oakwood that Acumatica ERP was the right system for them even though internal emails indicated that Acumatica ERP did not allow the multi-pick feature. Id. at 11–12.

In response, SWK offers seven arguments for why the court should deny Oakwood's motion for treble damages. First, SWK argues that it made no misrepresentations to Oakwood and that Oakwood's argument that SWK knew Acumatica ERP could not do multi-pick or credit card reauthorizations but concealed this

33

information is contradicted by the evidence at trial.  SWK, ECF No. 272 at 8–10.

According to SWK, the only evidence Oakwood points to in its motion to support this

assertion is the testimony of Dr. Stewart and Butler, which was a characterization made

by Oakwood's own witnesses and was contradicted by other evidence.  Id.  Second, SWK

argues that there is no evidence that it took action or failed to take action with knowledge

that such would violate the SCUTPA.  Id. at 10.  Third, SWK argues that the evidence

shows that the reason the Oakwood implementation of Acumatica ERP failed was

because of Oakwood's own internal disfunction and lack of leadership.  Id. at 10–12.

Fourth, SWK argues that Oakwood secretly abandoned its implementation of Acumatica

ERP without informing SWK.  Id. at 12–13.  Fifth, SWK asserts that "[i]t is undisputed

that Oakwood's implementation of the Acumatica ERP system could have been

successfully completed if Oakwood had not abandoned the project."  SWK, ECF No. 272

at 13–14.  Sixth, SWK contends that the jury's verdict did not reflect that Oakwood is

entitled to heightened damages.  Id. at 14.  Seventh and finally, SWK contends that the

other customers referenced in Oakwood's motion are irrelevant to its SCUTPA claim.  Id.

at 14–16.

      Acumatica responds with five arguments.  First, much like SWK, Acumatica

argues that the evidence does not support a finding that SWK's conduct was willful or

knowing violation of the SCUTPA.  SWK, ECF No. 274 at 2–3.  Acumatica maintains

that the testimony at trial indicates that SWK believed it could implement Acumatica

ERP to meet Oakwood's needs.  Id. at 2.  Acumatica characterizes the testimony at trial

as indicating that SWK's representatives were communicating with Oakwood during the

entire implementation with hopes of progressing the project until Oakwood ceased

communications.  Id.  Acumatica also notes that "where 'the record does not show any evidence that the alleged violation of [SCUTPA] . . . was willful and knowing[,]' a 'trial court [does not] err[] in refusing to award treble damages[.]'"  Id. at 1–2 (alterations in original) (quoting Top Value Homes, Inc. v. Harden, 460 S.E.2d 427, 430 (S.C. Ct. App. 1995)).  Second, Acumatica argues that the jury's defense verdict on the fraudulent nondisclosure claim weighs against a finding of willful conduct by SWK.  Id. at 3–4.  Third, Acumatica asserts that the issues faced by SWK's other customers do not amount to willful or knowing conduct on SWK's part with respect to this case.  Id. at 4.  Fourth, Acumatica reiterates its position that it did not engage in wrongdoing or hold SWK out as its agent for purposes of the ERP implementation.  Id. at 4.  Thus, even if the court awards treble damages, Acumatica asserts that it should not be held jointly liable for that award.  Id.  Fifth and finally, Acumatica argues that its liability is limited under the EULA to $69,513.00.  Id. at 5.

In reply, Oakwood begins by arguing that evidence of its interactions with SWK supports a treble damages award.  SWK, ECF No. 278 at 2–6.  It points specifically to Powell's testimony that Acumatica ERP could be customized to do "basically anything."  Id. at 3 (citing Tr. 704:25).  Oakwood argues that, despite Powell's assurances about the ability to customize Acumatica ERP, and despite SWK's salesmen witnessing Oakwood's specific needs, Acumatica ERP was intentionally designed to not accommodate many of those needs.  Id. at 4.  It then points to Buddecke's testimony that Acumatica ERP is designed to be customized as part of every implementation project but contrasts that with testimony from other witnesses indicating that customizations of Acumatica ERP were "out of scope."  Id. at 4–5 (first citing Tr. 639:21–640:20; and then

quoting Pl.'s Trial Ex. 10). Oakwood replies to SWK and Acumatica's arguments that Acumatica ERP could have worked for Oakwood had Oakwood not abandoned the project. Id. at 5–6. Oakwood argues that this further shows additional willful violations of the SCUTPA because it shows SWK was attempting to sell Oakwood a solution that Oakwood could not actually use. Id. Second, Oakwood reiterates that SWK engaged in a pattern of deceiving customers, as evidenced by SWK's interactions with Champion Thread, Arch-I-Tech Doors, and Tom Fouts Tire Co. Id. at 6–10. Oakwood contends that "SWK's violation of SCUTPA in its dealings with Oakwood alone is sufficient to warrant treble damages" but argues that SWK's conduct with these other customers indicates additional evidence of deceptive behavior. Id. at 6. Third, Oakwood replies to Acumatica's arguments. Id. at 11–13. Oakwood reiterates that there is evidence that SWK engaged in willful conduct and that it did so on Acumatica's behalf. Id. at 11. Oakwood then argues that the jury's verdict on the fraudulent nondisclosure claim was based on the higher standard of proof associated with that claim and that the jury's decision is therefore not instructive on the SCUTPA claim. Id. at 11–12. Beyond that, Oakwood further points out that proof of common law fraud is not necessary for it to prove its SCUTPA claim. Id. at 12. As for Acumatica's argument that it did not authorize SWK's violation of the SCUTPA, Oakwood argues that Acumatica authorized SWK to market, sell, and attempt to customize and implement Acumatica ERP on its behalf. Id. at 13. Finally, Oakwood reiterates that Acumatica's liability limitations in the EULA cannot be enforced as a matter of South Carolina public policy. Id..

The court finds that SWK's violation of the SCUTPA was willful, mandating a treble damages award in this case. For example, as alluded to previously, the evidence

presented at trial supports a finding that SWK's salesmen made assurances to Oakwood that Acumatica ERP was suitable for Oakwood's business based on SWK's understanding of Oakwood's business processes and that Oakwood relied on those assurances when deciding to purchase Acumatica ERP. Tr. 97:6–99:14, 301:19–302:12, 441:21–24; see also Pl.'s Ex. 4 at 6–7 (provisions in the SOW stating that SWK would "collect data and build a specification together [with Oakwood]" and would "focus on gathering key business requirements, forms and reporting requirements to help set the stage of configuring Acumatica to meet those requirements"). The evidence also supports a finding that multiple-pick shipping capabilities were essential to Oakwood's business, Tr. 355:4–356:2; that Oakwood expressed those needs to SWK during the discovery process, Tr. 98:1–19, 498:23–25; and that, despite SWK's representations, Acumatica ERP could not accommodate multiple-pick shipping in the manner required by Oakwood, Tr. 489:9–502:10, 595:9–600:17; Pl.'s Ex. 23 at 2 (internal emails between SWK and Acumatica indicating that Acumatica ERP has "holes that need to be fixed," including "[m]ultiple shipments from one order").

It may be true, as SWK argues, that SWK was not aware of the specific manner in which Oakwood conducted multiple-pick shipments when SWK's salesmen represented that Acumatica ERP would be a good fit for Oakwood. See Tr. 489:9–502:10, 595:9–600:17 (Potoka's testimony that Oakwood has a unique method of handling multiple-pick shipping). However, even if this is true, the evidence cited above indicates that SWK should have known this important aspect of Oakwood's needs, given how important this feature was to Oakwood's business and the time spent by the SWK salesmen learning Oakwood's needs. Id.; see Nest Egg, 348 S.E.2d at 384. This is especially true given

37

that some at SWK had their own internal concerns about the limits of Acumatica ERP's functionality with the multiple-pick shipping feature, which were apparently never communicated to Oakwood.  See Pl.'s Ex. 23; Tr. 598:25–599:5.  Ultimately, the court finds that evidence presented at trial shows that SWK's SCUTPA violation meets the definition of a willful violation under the statute and that treble damages are therefore in order.  See S.C. Code Ann. § 39-5-140(d); GTR Rental, 547 F. Supp. 2d at 522–23; Maybank, 787 S.E.2d at 518.

Additionally, the court also finds that Acumatica can be liable for the treble damages award given SWK's willful violation.  Though Acumatica is correct that the issue at trial was not whether Acumatica, itself, engaged in a willful or knowing, such is not a requirement for treble damages under the plain language of the SCUTPA.  See S.C. Code Ann. § 39-5-140(a), (d).  Instead, the SCUTPA provides that the court "shall" award treble damages "[i]f the court finds that the use or employment of the unfair or deceptive method, act or practice was a willful or knowing violation," and the SCUTPA provides that "a willful violation occurs when the party committing the violation knew or should have known that his conduct was a violation."  Id. (emphasis added).  Thus, while the decision of whether to award treble damages is based on whether SWK, "the party [that] committ[ed] the violation," should have known of the violation, nothing in the SCUTPA's language limits that liability to only SWK.  See id.

Beyond that, the court noted in a previous order that South Carolina law treats a SCUTPA claim as a tort, SWK, ECF No. 198 at 21 n.12, and under South Carolina law, a principal can be liable for similar torts committed by its agent, even in cases when the principal does not know about the agent's conduct.  For instance,

> [r]egardless of any subsequent ratification, a principal is liable to third parties for the fraud, deceit, concealment, misrepresentation, negligence and other malfeasance of an agent acting within the scope of his employment, even though the principal did not authorize, participate in or know of such misconduct, and even if the principal disapproved of or forbade the acts complained of.

18 S.C. Jur. Negligence § 32 (footnote omitted), Westlaw (database updated June 2025); accord 23 S.C. Jur. Agency § 79, Westlaw (database updated June 2025) ("[A] principal is liable to third parties in a civil suit for the frauds, in the course of his employment, although the principal did not authorize or justify or participate in, or know of such misconduct, or even if the principal forbade the acts of disapproved of them."); see also id. § 77 ("Where either the seller or the buyer has to suffer because of fraudulent representations of the seller's agent, the loss falls on the seller who put it in the agent's power to work wrong."). Thus, because SWK's SCUTPA violation was within the scope of its agency with Acumatica, Acumatica can be liable for the resulting treble damages award.

Consequently, the court grants Oakwood's motion for treble damages and amends judgment to increase damages from $275,000.00 to $825,000.00.

### 5. Oakwood's Motion for Prejudgment Interest

The South Carolina Code provides that "[i]n all cases of accounts stated and in all cases wherein any sum or sums of money shall be ascertained and, being due, shall draw interest according to law, the legal interest shall be at the rate of eight and three-fourths percent per annum." S.C. Code Ann. § 34-31-20(A).

Oakwood argues that it is entitled to recover prejudgment interest because its damages are capable of being calculated with certainty. SWK, ECF No. 257-1 at 6. Oakwood points to various trial exhibits in which it calculated its damages with

39

mathematical certainty to $562,860.29.  Id.  Oakwood argues that it does not matter that

the jury did not award this full amount and that it is still entitled to interest on the

damages awarded by the jury--$275,000.00.  Id. at 7.  Oakwood also notes that its

damage calculations takes into account damages beginning May 1, 2021.  Id. at 6.  Thus,

Oakwood specifically contends that it is entitled to interest that accrued during the 1,476

days between its initial damages on May 1, 2021, and the jury's verdict on May 16, 2025.

Id. at 8–9.  Applying the statutory rate of 8.75% on the $275,000.00 principal during this

1,476 day period, Oakwood calculates that it is entitled to $97,304.79 in prejudgment

interest.  Id. at 8–9; SWK, ECF No. 257-4 (table outlining Oakwood's calculations).

Alternatively, Oakwood notes that "the boilerplate terms of the [MSA] allowed SWK to

charge Oakwood interest at the rate of eighteen percent (18%) per year using a monthly

rate of 1.5%."  SWK, ECF No. 257-1 at 4.

     In response, SWK argues that the court "should exercise its discretion not to

award prejudgment interest to Oakwood because such an award would be inequitable

when the evidence shows the reason Oakwood's software implementation did not go live

was attributable at least as much to Oakwood as to SWK, SWK did not engage in any

intentional misconduct, and Oakwood indisputably did engage in intentional misconduct

targeted to cause prejudice to SWK and Acumatica."  SWK, ECF No. 270 at 1.  SWK

asserts that the court has discretion to determine whether to award prejudgment interest.

Id. at 6 (citing Liberty Mut. Fire Ins. Co. v. JT Walker Indus., 554 F. App'x 176, 192 (4th

Cir. 2014); and then citing Smith v. Britton-Harr, 2024 WL 449359, at *3 (D.S.C. Feb. 6,

2024)).  It claims that "[w]hen exercising its discretion to assess whether prejudgment

interest should be awarded, the Court should consider 'whether or not the measure of

recovery, not necessarily the amount of damages, is fixed by conditions existing at the time the claim arose.'" Id. at 6–7 (quoting Maybank v. BB&T Corp., 787 S.E.2d 498, 519–20 (S.C. 2016)). First, SWK highlights witness testimony indicating that Oakwood surreptitiously abandoned its contract with SWK and that Oakwood's internal problems led to difficulties with SWK's ability to complete the project. Id. at 7–12. It argues that these are reasons to deny Oakwood's request for prejudgment interest. Id. at 12. Second, Oakwood argues that, if the court does award prejudgment interest, it should assess that amount based on the statutory 8.75% interest rate. Id. at 12–13. Similarly, SWK argues that the only "sum certain amount" on which the interest should be measured based on the total amount Oakwood paid to SWK, which was $106,358.48—the maximum amount recoverable under the Liability Limitation Provision in the MSA. Id. at 13–14.

Like SWK, Acumatica also argues that the court should not award Oakwood prejudgment interest. Acumatica raises four arguments. First, Acumatica argues that Oakwood is not entitled to prejudgment interest because its damages were not liquidated. SWK, ECF No. 273 at 2–3. Acumatica asserts that "when a plaintiff bases its allegations on claims which give rise to jury considerations of damages, its damages are not liquidated or for a sum certain." Id. at 2 (citing Austin v. Stokes-Craven Holding Corp., 691 S.E.2d 135, 154 (S.C. 2010)). Acumatica argues that Oakwood's damages were not certain because they included unspecified "lost manhour expenses" and "other ancillary payments to technology consultants" that were not certain sums. Id. at 2–3. Second, Acumatica argues that, even if Oakwood is entitled to prejudgment interest, it should only be entitled to interest on its breach of contract and breach of warranty claims, neither of which apply to Acumatica. Id. at 3–4. Consequently, Acumatica argues that it should

not be held responsible for satisfying any award for prejudgment interests. Id. at 3.

Acumatica further argues that permitting Oakwood to recover prejudgment interest and

treble damages would be an impermissible double recovery for the same set of facts and

that Oakwood should be required to elect its remedies. Id. at 3–4. Third, Acumatica

argues that, if the court awards prejudgment interests, it should base its calculations on

the statutory 8.75% rate and not the 18% rate found in the MSA. Id. at 4. Fourth and

finally, Acumatica argues that the Liability Limitation provision in the EULA limit

Acumatica's total liability to $69,513.00. Id. at 4–5.

In reply, Oakwood argues that, at trial, it showed all of its expenses since the

failed Acumatica ERP implementation project by May 1, 2021, so these are expenses

capable of liquidation. SWK, ECF No. 270 at 2. Oakwood distinguishes Austin v.

Stokes-Craven Holding Corp., 691 S.E.2d 135, 154 (S.C. 2010), on the grounds that its

damages were all out of pocket expenses and not the diminution in value of property.

SWK, ECF No. 279 at 3. In contrast, Oakwood says it received no value from the failed

Acumatica ERP implementation project, so those damages amount to an ascertainable

sum. Id. at 3–4. Oakwood further argues that when the sum of damages is capable of

being reduced with certainty, the South Carolina Code provides that the court "shall"

award prejudgment interest. Id. at 5–8. Oakwood distinguishes the cases cited by

defendants on the grounds that those cases involved damages that were not ascertainable

to a mathematical certainty. Id. Alternatively, Oakwood argues that prejudgment interest

is specifically recoverable under the SCUTPA, which permits that the court "'may

provide such other relief as it deems necessary or proper" upon finding that the SCUTPA

violation was willful. Id. at 9 (quoting S.C. Code Ann. § 39-5-140(a)). Pursuant to this

section, Oakwood argues that the court could, after finding a willful violation, award prejudgment interest at 18% per year.  Id. at 9–10.  Finally, Oakwood argues that the liability limitation provision does not limit Oakwood's recovery for prejudgment interest because the provision does not specifically mention interest and because other jurisdictions have awarded prejudgment interest even when the award exceeds the liability limitation provisions.  Id. at 10–11.

This court has previously found that Section 34-31-20(a) is a mandatory requirement for prejudgment interest in certain cases based on the statute's use of the word "shall."  Liberty Mut. Ins. Co. v. Emp. Res. Mgmt., Inc., 176 F. Supp. 2d 510, 540 (D.S.C. 2001).  In any event, even if that were not the case, the court is not convinced by defendants' arguments regarding the equitable considerations in this case based on the evidence described in previous sections of this order.

That said, "prejudgment interest is not appropriate when a plaintiff seeks to recover unliquidated damages."  APAC Carolina, Inc. v. Town of Allendale, 41 F.3d 157, 165 (4th Cir. 1994).  "The proper test for determining whether prejudgment interest may be awarded is whether or not the measure of recovery, not necessarily the amount of damages, is fixed by conditions existing at the time the claim arose."  Babb v. Rothrock, 426 S.E.2d 789, 791 (S.C. 1993).  The court agrees with defendants that the damages associated with Oakwood's SCUTPA claim were not fixed at the time their claim arose.  For example, as Acumatica points out, Oakwood is seeking damages related to "lost manhours," the value of which could not have been calculated at the time the claim arose.  See Austin, 691 S.E.2d at 153–54 (finding that prospective damages were unliquidated at the time the claim arose when the damages "could not have been ascertained without

43

evidence of the retail value" of the motor vehicle at issue in the case). For this reason, the court finds that prejudgment interest is not available for damages Oakwood incurred related to its SCUTPA claim. See id.; see also Maybank, 787 S.E.2d at 519–20 (affirming trial court's decision to not award prejudgment interest on actual damages awarded as SCUTPA claim).

Still, the court permits Oakwood to collect prejudgment interest from SWK on damages related to its breach of contract and breach of warranty claims because those damages are based on the contract value of Oakwood's agreements with SWK. See GTR Rental, 547 F. Supp. 2d at 524–25 (awarding prejudgment interest on damages associated with the plaintiff's breach of contract claim but not the plaintiff's SCUTPA claim). Based on the court's 2022 Order, the liability limitation provision in the MSA is applicable to these claims, and Oakwood's recovery for both its breach of contract and breach of warranty claims are limited by contract to $106,358.48. Thus, Oakwood is able to recover prejudgment interest on this amount from SWK.[13]

---

[13] While the MSA's liability limitation provision does apply to limit damages available to Oakwood for its breach of contract and breach of warranty claims against SWK, the court finds that such does not limit the availability of prejudgment interest associated with those claims. Under South Carolina law, parties may contract around the statutory interest rate in section 34-31-20(A) by contracting for a different rate of interest. See, e.g., EllisDon Cost., Inc. v. Clemson Univ., 707 S.E.2d 399, 401 (S.C. 2011). However, that is not exactly what the parties did here because the liability limitation does not assign a different interest rate. Additionally, as discussed previously, public policy prohibits contractual provisions from completely eliminating a party's entitlement to damages available under a statute. See Simpson, 644 S.E.2d at 673. Following similar logic, the Georgia Court of Appeals has previously held that "prejudgment interests may not be limited by a provision that seeks generally to cap a party's contractual liability" when looking at a similar statute that mandated prejudgment interest. Crown Series, LLC v. Holiday Hospitality Franchising, LLC, 851 S.E.2d 150, 157 (Ga. Ct. App. 2020) (emphasis omitted). Consequently, the court finds that the liability limitations in the MSA do not apply to Oakwood's prejudgment interest award.

As such, the court awards prejudgment interest on $106,358.48 at 8.75% per year over 1,476 days, which the court calculates as $37,688.30.[14]  Accordingly, the court amends judgment to increase Oakwood's total recovery to $862,688.30.  However, because the court is awarding this interest based only on Oakwood's claims against SWK for breach of contract and breach of warranty, Acumatica is not liable for the prejudgment interest portion of Oakwood's total recovery.

### 6.  Oakwood's Motion for Attorney's Fees and Bill of Costs

The SCUTPA provides that, "[u]pon the finding by the court of a violation of this article, the court shall award to the person bringing such action under this section reasonable attorney's fees and costs."  S.C. Code Ann. § 39-5-140(a).  Additionally, Federal Rule of Civil Procedure 54(d) states that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party."  Fed. R. Civ. P. 54(d).  Oakwood argues in its motion that it is entitled to $551,708.01 in attorney's fees, SWK, ECF No. 284 ¶ 9, and filed a bill of costs claiming entitlement to $18,828.85, SWK, ECF No. 249.  Defendants do not appear

---

[14] During the hearing, SWK conceded that this calculation should be made based on 1,476 days, as Oakwood argues.  See ECF No. 209.

Additionally, the court applies the statutory rate, rather than the contractual interest rate Oakwood points to in the MSA.  Presumably, Oakwood is referring to the following sentence from the MSA: "If any invoice remains unpaid after thirty (30) days, the amount of such invoice may (at the discretion of SWK) bear interest at the lesser of one and one-half (1.5%) percent per month or the highest rate allowed by law, and SWK reserves the right to suspend all Services until payment, including interest, is received in full."  Pl.'s Ex. 3 at 2.  Oakwood suggests that, given this provision, the court should charge SWK the 18% annual interest rate rather than the statutory 8.75%.  SWK, ECF Nos. 257-1 at 4, 8–9;  257-3 (table showing prejudgment interest calculations at 18%). However, Oakwood provides no support for this suggestion, and the plain language of the MSA provision in question clearly does not entitle Oakwood to an 18% interest rate.  See Pl.'s Ex. 3 at 2.   Not only does the provision clearly only apply to interest charged by SWK, the provision does not even purport to cover post-judgment interest awarded by a court.

45

to dispute Oakwood's bill of costs, so the court focuses analysis on Oakwood's claim for attorney's fees under the SCUTPA.

Local Civil Rule 54.02 (D.S.C.) requires that "[a]ny petition for attorney's fees shall comply with the requirements set forth in Barber v. Kimbrell's, Inc., 577 F.2d 216 (4th Cir. 1978), and shall state any exceptional circumstances and the ability of the party to pay the fee." In Barber, the Fourth Circuit mandated that district courts must consider and produce "detailed findings" regarding the following twelve factors in determining the propriety of an attorney's fee award:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

577 F.2d at 226 & n.28. Of these twelve factors, the only two in dispute in this case are the first factor and the eighth factor. However, because the court must consider each factor, the court will take each in turn.

### a.       Time and Labor Expended

Oakwood emphasizes the significant time that was spent over the last several years and the multiple motions and discovery disputes that were involved. SWK, ECF N. 248-1 at 6–7. In response, defendants raise a number of issues, and the court will examine each of these issues in turn.

First, SWK argues that Oakwood is not entitled to attorney's fees or non-taxable costs incurred before it amended its complaint on July 6, 2022, when it asserted its

46

SCUTPA claim for the first time.  SWK, ECF No. 256 at 16–18 (citing Taylor v. Medenica [Taylor I], 479 S.E.2d 35, 47 (S.C. 1996)).  Thus, SWK calculates that Oakwood's attorney's fees should be reduced by $124,076.15—the total dollar amount of attorneys' fees incurred prior to July 6, 2022.  Id. at 18 (citing SWK, ECF No. 256-1 (table showing Oakwood's counsel's billing entries from prior to July 6, 2022)).  In contrast, Oakwood argues that there is nothing in the SCUTPA limiting its attorney fee recovery to only those fees incurred after it added its SCUTPA claim.  SWK, ECF No. 264 at 4–6.  It further notes that its SCUTPA claim and its other claims derive from the same operative facts.  Id. at 4.  Oakwood also argues that SWK misstated Taylor because the South Carolina Supreme Court did eventually affirm (in a later appeal) an attorney's fee award that included time spent before the plaintiff filed the second amended complaint.  Id. at 6 (citing Taylor v. Medencia [Taylor II], 503 S.E.2d 458, 460 (S.C. 1998)).

        The court agrees with SWK on this issue.  In Taylor, the plaintiff had filed an original complaint that included claims under the SCTUPA in March 1993.  Taylor I, 479 S.E.2d at 44.  However, she then amended her complaint in December 1993 to remove all of her causes of action except negligence.  Id.  Then, in January 1995, she amended her complaint again to assert a SCUTPA claim.  Id.  The plaintiff ultimately prevailed at trial on her SCUTPA claim as well as on claims for negligence and loss of consortium.  Id. at 38.  The trial court found that the defendants had willfully violated the SCUTPA and thus awarded treble damages and found that the plaintiff was entitled to attorney's fees but declined to determine a fee amount.  Id. at 38 & n.3.  The trial court also required that the plaintiff elect between remedies available for her negligence claim and her SCUTPA

47

claim, and the plaintiff elected her negligence claim.  Id. at 38.  In Taylor I, the South

Carolina Supreme Court reversed the trial court's decision to require the plaintiff to elect

remedies after finding that the plaintiff's negligence and SCUTPA claims were based on

separate facts.  479 S.E.2d at 44–45.  The court then remanded the matter for the trial

court to "consider [the plaintiff's] application for attorney's fees and costs from the date

on which she filed her second amended complaint alleging a violation of the [SCUTPA]."

Id. at 47.

On remand, the trial court awarded $500,000 in attorney's fees and $24,068 in

costs.  Taylor II, 503 S.E.2d at 459.  The defendants then appealed again, and the South

Carolina Supreme Court reviewed the fee award in Taylor II.  Id.  On appeal, the

defendants complained that the trial court had based its fee award, in part, on attorney

affidavits that included time billed by the plaintiff's attorneys from before the plaintiff

filed her second amended complaint.  Id. at 460.  As Oakwood points out, the supreme

court affirmed the attorney's fee award over the defendant's objection.  Id. at 461–62.

However, Oakwood overlooks the court's reasoning for doing so.  Rather than endorsing

the trial court's inclusion of time billed before the plaintiff had amended her complaint,

the court specifically stated that the affidavits were "somewhat deficient" because, among

other reasons, they included time for work performed prior to the filing of her second

amended complaint.  Id. at 461.  However, the court ultimately affirmed the attorney's

fee award "[i]n spite of these deficiencies" because other evidence in the record indicated

that the plaintiff's attorneys had spent considerable time working on the case after filing

her second amended complaint that was not submitted for reimbursement.  Id. (emphasis

added).

Thus, contrary to Oakwood's argument, <u>Taylor II</u> is not an endorsement of awarding attorney's fees for work performed by a plaintiff's attorneys from before the plaintiff asserted a SCUTPA claim.[15]  For this reason, Oakwood's attorney's fee award cannot include hours billed before Oakwood amended its complaint to assert a SCUTPA claim on June 6, 2022, which amounts to $124,076.15.

Moving to the second issue, defendants argue that Oakwood's fee request should be further reduced based on work counsel conducted after July 6, 2022, on causes of action other than its SCUTPA claim.  <u>SWK</u>, ECF No. 256 at 18–22.  Defendants contend that "[t]he requested attorneys' fees and non-taxable costs should be reduced to prevent the recovery of fees and costs incurred prosecuting dismissed claims, abandoned claims, or any other claim that was not brought under the SCUTPA."  <u>Id.</u> at 18.  However, because Oakwood's invoices are not organized by cause of action, defendants propose that Oakwood's recovery for post-July 6, 2022 attorney's fees should be reduced in proportion to the number of causes of action.  <u>Id.</u> at 19.  In other words, because Oakwood originally pursued five causes of action against SWK, Oakwood should only recover 1/5 of its post-July 6, 2022 attorney's fees and costs because its SCUTPA claim is one of those five claims.  <u>Id.</u>  Under this formula, defendants calculate that Oakwood should only recover $78,94.42 in attorney's fees and $2,816.18 in non-taxable costs.  <u>Id.</u>  Thus, when combined with Oakwood's taxable costs ($18,828.85), Oakwood's total recovery would be $100,589.45.  <u>Id.</u> at 20.  Defendants note that the courts in <u>Haley</u>

---

[15] Indeed, the supreme court specifically reiterated in a footnote in <u>Taylor II</u> that its remand instructions had been for the trial court "to consider [the plaintiff's] application for attorney's fees and costs <u>from the date on which she filed her second amended complaint alleging a violation of the [SCUTPA]</u>."  <u>Taylor II</u>, 503 S.E.2d at 460.

Nursery, 318 S.E.2d at 909, and Maybank, 787 S.E.2d at 518, similarly reduced the plaintiffs' attorney's fees after a successful SCUTPA claim to account for work the plaintiffs' counsel had performed on other causes of action when the counsels' invoice did not specifically account for what work was dedicated exclusively to the SCUTPA claim. SWK, ECF No. 256 at 20–21. Further, defendants argue that any ambiguity in Oakwood's counsel's records should be construed in favor of a fee reduction, not more fees, so that Oakwood does not receive a windfall as a result of its counsel's nondescriptive recordkeeping. Id. at 22.

In reply, Oakwood contends that the court should not apply a percentage to reduce its attorney fee award when its claims are all based on the same set of facts. SWK, ECF No. 264 at 6–10. Oakwood argues that when every claim results from the same set of facts, it can be difficult to divide counsel's time between claims, meaning the court "should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." SWK, ECF No. 264 at 7 (quoting Hensley, 461 U.S. at 435). Further, Oakwood contends that a mathematical division of the fee award by the number of causes of action would not be appropriate or fair. Id. at 7–8. Oakwood seeks to distinguish Haley Nursery, 381 S.E.2d 906, on the grounds that, in that case, part of the reduction in the fee award was because the parties had prevailed on claims against each other. SWK, ECF No. 264 at 9–10.

The court is not going to reduce Oakwood's attorney's fee award based on time spent by Oakwood's counsel working on its other successful causes of action. For one thing, during the hearing, SWK conceded that almost all discovery after Oakwood filed its second amended complaint was related to Oakwood's SCUTPA claim. See SWK,

ECF No. 288. Additionally, Oakwood correctly notes that the reason the court appears to have reduced fees in Haley Nursery is because the defendant had prevailed on a counterclaim against the plaintiff, which is not true in this case. See 381 S.E.2d at 909.

Moreover, in Austin, 691 S.E.2d at 142, the plaintiff had prevailed at trial on a claim under the Dealer's Act, negligence, fraud, and constructive fraud. After the trial, the trial court required the plaintiff to elect remedies between his common law claims and his claim under the Dealer's Act. Id. at 152. The plaintiff chose his common law claims, for which the jury had awarded him punitive damages. Id. On appeal, he argued that the trial court erred by requiring that he elect remedies between his common law claims and his claim under the Dealer's Act because doing so prevented him from recovering attorney's fees and costs which would have been available to him as a statutory remedy under the Dealer's Act. Id. The South Carolina Supreme Court agreed and overturned the trial court's requirement that he elect remedies. Beyond that, because "it would be difficult to dissect [the plaintiff's] counsel's fee affidavit to ascertain how much time was spent on this particular claim given the violation of the Act was based on the same facts and circumstances underlying his claims for fraud and constructive fraud," the court determined that the plaintiff was entitled to the entirety of his attorney's fee request. Id. at 153–54.

Given that Oakwood's breach of contract and breach of warranty claims arise out of the same factual circumstances as its SCUTPA claims and that all discovery after the second amended complaint was related to Oakwood's SCUTPA claim, the court will not reduce Oakwood's fee award to account for work after the second amended complaint on Oakwood's other successful causes of action.

Moving to the third issue, SWK argues that Oakwood should not be able to recover attorney's fees for work counsel spent preparing to contact SWK and Acumatica customers who the court did not permit to Oakwood to contact.  SWK, ECF No. 256 at 23–25.  For example, SWK notes that there are multiple entries for hours spent by Oakwood's counsel preparing letters and subpoena directed at and preparing research pertaining to customers, such as YMA America, EX2 Technologies, Parker Ranch, Pinehurst Medical, Visionary Technology, and Eagle Carports, but counsel was later forced to withdraw those subpoenas because the court did not permit contact with those customers.  Id. at 23–24.  SWK calculates that, with the removal of the time billed for work pertaining to these customers, Oakwood's fee award must be reduced by $60,644.50.  SWK, ECF No. 256 at 23.  In contrast, Oakwood argues that its fee award is appropriate because it billed for necessary steps toward its prevailing on its SCUTPA claim, and "[f]ees for time spent on claims that ultimately were unsuccessful should be excluded only when the claims are distinctly different in all respects, both legal and factual, from plaintiff's successful claims."  SWK, ECF No. 264 at 11 (citing Morgan v. D.C., 824 F.2d 1049, 1066 (D.C. Cir. 1987)).

Relatedly, defendants argue that the time and labor expended by Oakwood's counsel was excessive.  SWK, ECF No. 256 at 15; Acumatica, ECF No. 187 at 2–4 (incorporating SWK's memo on the Barber factors).  They note that, even if the jury had awarded the full damages requested by Oakwood, Oakwood's attorney's fees would still be roughly equal to the damages.  Id.  They accuse Oakwood's counsel of "consistently over-work[ing] the discovery process and expend[ing] unreasonable time and labor."  Id.  They claim that Oakwood's counsel insisted on taking days or hours to depose witnesses

even after those witnesses had indicated they did not have any information on the subject of counsel's questions, and Oakwood did not end up using that testimony at trial.  Id. at 15.

The court agrees that the discovery in this case has been long and complicated. Nevertheless, the court finds that Oakwood's efforts at discovery were reasonable, as they were in furtherance of its efforts to seek discoverable information related to its SCUTPA claim in this case.  Beyond that, SWK has not provided any legal citation to support its argument that a fee award should be reduced for work as to its other customers even if the court did not ultimately permit contact with those customers.

In sum, the court finds, based on the first factor, that Oakwood is not entitled to attorney's fees incurred prior to filing its second amended complaint on July 6, 2022, meaning its fee award must be reduced by $100,589.45.  In other words, its maximum attorney's fee recovery is $451,119.56.[16]

### b.     Novelty and Difficulty of the Questions Raised

As for the second factor, Oakwood argues that prevailing on SCUTPA claims is difficult and rare.  SWK, ECF No. 248-1 at 7.  It argues that there was a significant amount of factual information to learn and process in this case, such as information relating to complex software systems, and that the time spent learning this information

---

[16] Defendants also argue that attorney's fees should not be awarded because such fees are barred by their respective liability limitation provisions and because they are entitled to judgment as a matter of law on Oakwood's claims.  SWK, ECF No. 256 at 8, 11–14, 26–27; Acumatica, ECF No. 187 at 2–4.  The court rejects these arguments for the same reasons discussed above in its consideration of both defendants' renewed motions for judgment as a matter of law and Oakwood's motion to invalidate liability limitation provisions with respect to statutory damages.

supports its requested attorney's fee amount.  Id.  Defendants do not challenge

Oakwood's reasoning on this factor, and the court agrees with the parties.

### c.      Skill Required to Properly Perform the Legal Services Rendered

As for the third factor, Oakwood argues that its counsel demonstrated skill by

prevailing on several causes of action despite having no subject matter expertise in the

software industry.  SWK, ECF No. 248-1 at 7–8.  Defendants do not challenge

Oakwood's reasoning on this factor, and the court agrees with the parties.

### d.      Attorney's Opportunity Costs in Pressing the Instant Litigation

Moving to the fourth factor, Oakwood contends that this case required its counsel

to expend more than 2,600 hours of time, which its counsel discounted to reflect the

2,453 hours on the invoices.  SWK, ECF No. 248-1 at 8 (citing Lesemann Aff. ¶ 16).

This, according to Oakwood, created large opportunity costs for counsel.  Id.  Defendants

do not challenge Oakwood's reasoning on this factor, and the court agrees with the

parties.

### e.      Customary Fee for Like Work

As to the fifth factor, Oakwood points to the fact that, its counsel, Ellis Lesemann,

billed at an hourly rate of $375; his associates billed at $295 per hour; and paralegals

billed at $125 per hour.[17]  SWK, ECF No. 248-1 at 9.  Oakwood also points to affidavits

and declarations from various attorneys in the area who say that this was below market

rates in this area.  Id. (citing SWK, ECF Nos. 248-5, Kropski Aff. ¶¶ 10–14; 248-7,

---

[17] Oakwood also notes that Ann Cunniffee, one of its other attorneys, billed at $125 per hour even after her law license was reinstated.  SWK, ECF No. 248-1 at 9.

McLaughlin Aff. ¶ 9; 248-6, Horton Decl. ¶¶ 7–9, 15.)  Defendants do not dispute Oakwood's assessment of this factor, and the court agrees with the parties.

### f.      Attorney's Expectations at the Outset of the Litigation

Oakwood contends the sixth factor is largely irrelevant to this case because its counsel's fee was not contingent.  <u>SWK</u>, ECF No. 248-1 at 10.  Defendants do not dispute Oakwood's reasoning on this factor, and the court agrees with the parties.  <u>See Liberty Mut. Ins. Co.</u>, 176 F. Supp. 2d at 535.

### g.      Time Limitations Imposed by the Client or Circumstances

Oakwood similarly contends that the seventh factor is neutral.  <u>SWK</u>, ECF No. 248-1 at 10.  Defendants do not dispute Oakwood's reasoning on this factor, and the court agrees with the parties.

### h.      Amount in Controversy and Results Obtained

As to the eighth factor, Oakwood emphasizes that it prevailed on its SCUTPA claims against both SWK and Acumatica and was awarded $275,000 in damages.  <u>SWK</u>, ECF No. 248-1 at 10–11.  While Oakwood acknowledges that this is less than the $562,820.29 in damages it sought, it argues that prevailing on all claims and receiving the total amount of damages sought is very rare.  <u>Id.</u>  Oakwood contends that, though its fees and expenses exceed the amount of the verdict, this should have no bearing on the court's determination of the amount of reasonable fees.  <u>Id.</u> at 11–12.  In contrast, defendants argue that it is not reasonable to award $562,820.29 in attorney's fees when that amount is "grossly disproportionate" to the $275,000.00 jury verdict.  <u>SWK</u>, ECF No. 256 at 16.

While Oakwood's fee request is certainly high, it is several hundred thousand dollars lower than Oakwood's total recovery in this case, given that Oakwood is

recovering treble damages.  Consequently, the court finds that Oakwood's success in this case favors its recovery of attorney's fees incurred after it filed its second amended complaint.

### i.     Experience, Reputation and Ability of the Attorney

On the ninth factor, Oakwood argues that its lawyers are very experienced and have good reputations, justifying their fees.  SWK, ECF No. 248-1 at 12–13.  Defendants do not dispute Oakwood's reasoning on this factor, and the court agrees with the parties.

### j.     Undesirability of the Case Within the Legal Community in Which the Suit Arose

Oakwood does not consider itself or its case undesirable and argues that the tenth factor is neutral.  SWK, ECF No. 248-1 at 13.  Defendants do not dispute Oakwood's reasoning on this factor, and the court agrees with the parties.

### k.     Nature and Length of the Professional Relationship Between the Attorney and Client

On the tenth factor, Oakwood notes that "Mr. Lesemann has previously represented Oakwood in legal matters separate from the pending case."  SWK, ECF No. 248-1 at 13.  Defendants do not dispute Oakwood's reasoning on this factor, and the court agrees with the parties.

### l.     Attorneys' Fees Awards in Similar Cases

Finally, as to the twelfth factor, Oakwood argues that its requested award is similar to awards in other complex business litigation cases in South Carolina.  SWK, ECF No. 248-1 at 13–15 & nn.2–6 (first citing GTR Rental, 547 F. Supp. 2d 510, 524 (D.S.C. 2008); then citing Sonoco Prods. Co. v. Guven, 2015 WL 127990, at *14 (D.S.C. Jan. 8, 2015); then citing Taylor II, 503 S.E.2d at 462; then citing Super Duper, Inc. v. Mattel, Inc., 2009 WL 866463 (D.S.C. Mar. 31, 2009); then citing Palmetto Health Credit

56

Union v. Open Sols. Inc., 2011 WL 11702, at *9 (D.S.C. Jan. 4, 2011); and then citing

Maybank, 787 S.E.2d 498).  Defendants do not dispute Oakwood's reasoning on this

factor, and the court agrees with the parties.

In sum, the court finds that Oakwood is entitled to $18,828.85 in costs and

$451,119.56 in attorney's fees.[18]  In total, this increases Oakwood's total recovery by

$469,948.41.  Thus, the court amends judgment to reflect Oakwood's total recovery of

$1,332,636.71.

### C.  Motion on Acumatica's Crossclaim

### 7.  Acumatica's Motion for Judgment as a Matter of Law on its Crossclaims Against SWK

Acumatica argues that it is entitled to judgment as a matter of law on its

crossclaim against SWK for indemnity and contribution.  SWK, ECF No. 266.  However,

the court is not sure of the procedural basis for this motion.  It purports to be a motion for

judgment as a matter of law, see SWK, ECF No. 266, and SWK assumes that it is moving

pursuant to Rule 50(a), see SWK, ECF No. 269 at 10.  However, that Rule provides only

for motions for judgment as a matter of law made after "a party has been fully heard on

an issue during a jury trial" and requires that such motions be made "at any time before

the case is submitted to the jury."  Fed. R. Civ. P. 50(a); accord Long v. Libertywood

Nursing Center, 2015 WL 777717, at *3 (M.D.N.C. Feb. 24, 2015) ("This matter has not

reached a trial before a jury, and as a result, this court cannot enter judgment as a matter

of law for Plaintiff pursuant to Rule 50(a)."), aff'd 603 F. App'x 224 (4th Cir. 2015).  Yet

---

[18] This sum represents the total value of attorney's fees Oakwood may recover. At the hearing, the parties noted that only a small portion of this sum represents Oakwood's fees incurred in bringing its claims against Acumatica.  See SWK, ECF No. 288.

Acumatica neither presented its crossclaims to the jury nor did it move for judgment as a matter of law on those claims before this case was submitted to the jury. See Tr. 540:4–547:2 (arguments on Acumatica's motion for judgment as a matter of law presented after the close of Oakwood's case at trial).

Therefore, the court finds that a motion for judgment as a matter of law pursuant to Rule 50(a) is not appropriate at this time and denies Acumatica's motion without prejudice accordingly. The court directs Acumatica and SWK to file briefing on how they propose to proceed with Acumatica's crossclaims at this stage in the proceedings and, relatedly, what evidence the court may use in resolving any factual questions that may present themselves in as it considers those crossclaims.[19]

---

[19] The court sees this case as unfolding in two phases. The first phase involved adjudication of Oakwood's claims against the two defendants. When the jury returned its verdict, that phase ended, but it did not resolve all of the issues in this case. See Fed. R. Civ. P. 54(b) ("When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."); see also Fed. R. Civ. P. 13(g) (stating that a "crossclaim may include a claim that [a] coparty is or may be liable to the crossclaimant for all or part of a claim asserted in the action against the crossclaimant"). Thus, now that the court has entered judgment on Oakwood's claims against SWK and Acumatica, we are entering the second phase of this case, in which the court will adjudicate Acumatica's crossclaim against SWK.

Alternatively, the court notes that the evidence presented in this case shows that SWK and Acumatica have been working together for quite some time and appear to have created a mutually beneficial business relationship. The court wonders whether these businesses would prefer to resolve their present dispute between themselves, rather than proceeding with this lawsuit.

### III.   CONCLUSION

For the reasons set forth above, the court (1) **DENIES** SWK's renewed motion for judgment as a matter of law, motion for new trial <u>nisi</u> remittitur, and/or motion for a new trail; (2) **DENIES** Acumatica's renewed motion for judgment as a matter of law; (3) **GRANTS** Oakwood's motion to invalidate limited liability provisions as to its statutory remedies, (4) **GRANTS** Oakwood's motion for treble damages, (5) **GRANTS** Oakwood's motion for prejudgment interest, (6) **GRANTS** Oakwood's motion for attorney's fees, and (7) **DENIES WITHOUT PREJUDICE** Acumatica's motion for judgment as a matter of law on its crossclaims.  Consequently, the court **AMENDS JUDGMENT** to reflect Oakwood's total recovery of **$1,332,636.71**.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 1, 2025**
**Charleston, South Carolina**